Venantius Nkafor NGWANYIA, et al., Plaintiffs,

v.

John ASHCROFT, Attorney General, et al., Defendants.

No. Civ. 02–502(RHK/AJB).

United States District Court, D. Minnesota.

Feb. 12, 2004.

---

2. Plaintiff's counsel has itemized the filing fee, copies, postage, and long distance telephone charges.

Mary A. Kenney and Nadine K. Wettstein, American Immigration Law Founda-

tion, Washington D.C.; Iris Gomez, Massachusetts Law Reform Institute, Boston, Massachusetts; and James K. Langdon II, Dorsey & Whitney, Minneapolis, Minnesota, for Plaintiffs.

Greg D. Mack and Jennifer L. Lightbody, Office of Immigration Litigation, United States Department of Justice, Washington D.C.; Fred Siekert, United States Attorney's Office, Minneapolis, Minnesota, for Defendants.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

This matter comes before the Court on cross-motions for summary judgment. Plaintiffs, on behalf of a class of asylees[1] with pending applications for lawful permanent residence status in the United States, have sued Attorney General John Ashcroft, Secretary of the Department of Homeland Security Tom Ridge, the Department of Homeland Security, Director of the Bureau of Citizenship and Immigration Services Eduardo Aguirre, Jr., and the Bureau of Citizenship and Immigration Services (collectively, "Defendants"),[2] alleging that Defendants have improperly administered the system by which asylees become lawful, permanent residents of the United States.

Plaintiffs have moved, and Defendants have filed a cross-motion, for partial summary judgment on two issues: (1) whether approximately 22,000 unused refugee admission numbers, as a matter of law, remain available for use at this time, and (2)

---

1. "Asylees" refers to individuals granted asylum in the United States.

2. Effective March 1, 2003, the Immigration and Naturalization Service ("INS") was abolished and its immigration benefits and services functions were transferred to the newly created Bureau of Citizenship and Immigra-

tion Services division within the Department of Homeland Security. Under Fed.R.Civ.P. 25(d), the Court will substitute Defendants Ridge, Aguirre, Department of Homeland Security, and the Bureau of Citizenship and Immigration Services for former agency director Zigler and the now abolished INS.

whether Defendants' policies and practices with regard to employment documents violate Plaintiffs' statutory authorization to work. For the reasons set forth below, the Court will grant Plaintiffs' motions and deny Defendants' motions.

## Background

### I. Statutory and Regulatory Background

Prior to 1980, the United States had no uniform system for admitting and resettling refugees and asylees. *See generally Steel on Immigration Law, 2d* § 8:1 (2003). While Congress had enacted legislation with respect to various classes of refugees, federal refugee policy consisted largely of ad hoc programs developed in response to separate mass-refugee crises. *Id.* Refugees and asylees who did not fall into any of these categories were dependent upon the Attorney General's discretionary power to "parole" aliens into the United States. *Id.* Thus, pre–1980 refugee and asylee law was a patchwork of ad hoc legislation and executive grace.

Through the Refugee Act of 1980, Congress replaced this chaotic and arbitrary system with one designed to

> provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted.

Refugee Act of 1980, § 101(b), Pub.L. 96–212; *accord* Aliens and Nationality, Refugee and Asylum Procedures, 46 F.R. 45116 (September 10, 1981) (INS application of this stated purpose to the asylee adjustment provisions of the statute). Through the Refugee Act, Congress codified the United Nation's definition of "refugee," [3] 8 U.S.C. § 1101(a)(42), curtailed the Attorney General's parole power, *id.* § 1182(d)(5), and standardized the admissions process for refugees and asylees, *id.* §§ 1157–59.

### II. Asylees and the Endorsement of Work Authorization

Under the Refugee Act, "[a]ny alien who is physically present in the United States ... may apply for asylum." *Id.* § 1158. If the applicant can establish that he or she is a "refugee," within the meaning of 8 U.S.C. § 1101(a)(42)(A), and meets other criteria, such as a well-founded fear of persecution, *see* 8 C.F.R. § 208.13(b), the applicant may be granted asylum in the United States. Asylee status is indefinite; it does not automatically expire. 8 C.F.R. § 208.14(d). An asylee's status can change, however, if either (1) the government adjusts the asylee's status to that of a lawful permanent resident, *see* 8 U.S.C. § 1159(b), or (2) the asylee's status is terminated, *see* 8 U.S.C. § 1158(c)(2); 8 C.F.R. § 208.24.[4]

**3.** "Refugee" is currently defined as "any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). The definition also allows for refugee status to be granted "in such special circumstances as the President ... may specify" after consulting with Congress. *Id.* The definition of "refugee" explicitly does not include "any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.*

**4.** An asylee's status can be revoked for several reasons, including (1) a showing of fraud in the application process, (2) a change in the circumstances in the sending country, or (3)

Aliens may be granted asylum by either the executive branch or the judiciary. In general, an alien who has not been placed in immigration proceedings may file an administrative application with the Bureau of Citizenship and Immigration Services's Asylum Office. 8 C.F.R. § 208.4(b). After receiving that application, an Asylum Officer will interview the alien to determine whether asylum is appropriate. *Id.* Should the Asylum Officer deny the application, the alien is referred to the Executive Office of Immigration Review for administrative proceedings.[5] *Id.* §§ 208.14(c), 1208.2(b). If the Executive Office also denies asylum, the alien may seek further review before the appropriate United States Court of Appeals. 8 U.S.C. §§ 1105a, 1252(a)(1).

Upon a grant of asylum, the Attorney General must authorize the asylee to work in the United States and provide appropriate endorsement of that authorization. *Id.* § 1158(c)(1)(B). Defendants provide two types of endorsement. The Employment Authorization Document, which includes a photograph and fingerprint of the asylee, must be renewed every year at a cost of $120. 8 C.F.R. § 103.7(b)(1). Renewal takes at least ninety days. (Pls.' Ex. 11 (Department of Justice, INS Office of Business Liaison, "Employment Authorization of Aliens," Employer Information Bulletin 108 (March 2002)).) Alternatively, since the onset of litigation in this case, Defendants have allowed asylees to use their I–94 "Arrival–Departure Record" card as an endorsement of their authorization to work. The I–94 card, which is given to every alien upon entry into the United States, contains the asylee's name, address, and country of citizenship, and states: "Asylum status granted indefinite-

ly pursuant to 208 of the INA." (Pls.' Ex. 11 (Affirmative Asylum Procedures Manual, Office of International Affairs, Asylum Division (Fed.2003)).) Because there is no national policy regarding the expiration of the I–94 card, when–or whether–an I–94 card expires depends upon the practices of the branch office issuing it. (Defs.' Resp. to Pls.' Mem. in Supp. of Second Mot. for Summ. J. at 4.)

While asylees are theoretically authorized to work whether they have an endorsement or not (*see* Defs. Ex. 7 (Dea Carpenter, Deputy General Counsel, Department of Justice, *Employment Authorization of Aliens Granted Asylum* (June 17, 2002)) [hereinafter "Carpenter Memorandum"]), an employer cannot hire an asylee without the appropriate documentation, 8 U.S.C. § 1324a(b). Therefore, a valid endorsement, of whatever kind, is of great practical import.

### III. Asylee Adjustment

Under the Refugee Act, as amended, the President may authorize the admission of fifty thousand refugees each fiscal year. 8 U.S.C. § 1157(a). Out of that number, the Attorney General may, at his discretion, use up to ten thousand refugee admission numbers to adjust asylees already in this country to the status of lawful permanent residents. *Id.* § 1159(b). For asylees, lawful-permanent-resident status confers many advantages. For instance, lawful permanent residents may apply for citizenship after five years, *id.* § 1427(a), petition to immigrate close family members, *id.* §§ 1151, 1153, and travel abroad freely, *id.* § 1101(a)(13)(C). Because lawful-permanent-resident status is a prerequisite for

---

discovery that the asylee *no longer qualifies* as a "refugee." *See* 8 C.F.R. § 208.24.

**5.** Immigration proceedings within the Executive Office of Immigration Review include ad-

judication before an Immigration Judge, *id.* § 1208.2(b) and, in the event asylum is not granted, review by the Board of Immigration Appeals, *id.* § 1003.1(b)(1)-(3).

naturalization, any delay in adjustment inevitably postpones an asylee's ability to apply for citizenship.

In each fiscal year since 1992, the Attorney General has set aside the full ten-thousand refugee admission numbers authorized by statute.[6] The INS considers itself "obligated to reach the 10,000 allotment for asylee adjustment set by Congress," and acknowledges that "[t]his is an important benefit for asylees that we are required to fulfill." (Pls. Ex. 3 (Update on Asylee Adjustment Procedures (Jan. 29, 1997)) at 1.) Yet despite having an excess number of applicants in each year except 1995 (see Pls.' Ex. 1 (INS Cap Proposal, May 18, 2001) n. 1),[7] the immigration services have routinely failed to provide the authorized adjustments (see Pls.' Ex. 2 (Asylee Workload and Immigrant Statistics, Fiscal Years 1991–2002)).[8] INS processing errors "have hastened the growth in the number of pending cases." (Pls.' Ex. 5 (Memorandum from William R. Yates, INS Deputy Executive Associate Commissioner, to Kevin D. Rooney, INS Acting Commissioner (May 21, 2001)) at 1.) As one INS official stated in 2001, "[W]e have a process that almost guarantees that we will not fully use the 10,000 numerical allocation provided by statute." (Pls.' Ex. 4 (Email from William R. Yates, INS Deputy Executive Associate Commissioner, to Fuji O. Ohata, INS Associate Commissioner (Jan. 24, 2001)).)

In total, between 1994 and 2002, at least 21,822 of the refugee admission numbers set aside by the Attorney General for asylee adjustment went unused. (Pls.' Ex. 2.) According to Defendants, these numbers may not be used to reduce the waiting list because

> the adjustment figures available for any given fiscal year expire at the end of that fiscal year, and they are not available in a subsequent fiscal year because the prior years' adjustment figures have expired and there is no statutory authority or requirement to retroactively grant adjustment using a prior fiscal year's allotment of adjustment figures.

(Defs.' Rule 26(f) Report at 6.)

### Standard of Decision

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*,

---

**6.** *See* 67 F.R. 65469 (Oct. 25, 2002); 66 F.R. 63487 (Dec. 10, 2001); 65 F.R. 59697 (Oct. 6, 2000); 64 F.R. 54505 (Oct. 7, 1999); 63 F.R. 54999 (Oct. 13, 1998); 62 F.R. 53219 (Oct. 10, 1997); 61 F.R. 56869 (Nov. 4, 1996); 60 F.R. 53091 (Oct. 11, 1995); 59 F.R. 52393 (Oct. 17, 1994); 58 F.R. 52213 (Oct. 7, 1993); 57 F.R. 47253 (Oct. 15, 1992); 56 F.R. 51633 (Oct. 15, 1991).

**7.** Between fiscal years 1993 and 2002, more than 10,000 asylee adjustment applications were filed in each fiscal year, save for 1995. The numbers demonstrate a dramatic escala-

tion in the number of applications, as follows: FY 1993 10,018; FY 1994, 10,016; FY 1995, 9,025; FY 1996, 11,838; FY 1997, 19,424; FY 1998, 15,329; FY 1999, 19,353; FY 2000, 32,104; FY 2001 29,353; FY 2002, 45,547. (Pls.' Ex. 1 at n. 1.)

**8.** According to INS statistics, the agency used only a portion of the asylee adjustment set aside in at least the following years: FY 1994, 5,983; FY 1995, 7837; FY 1998, 7546; FY 1999, 2,532; FY 2000, 4,567; and FY 2002, 9,713. (Pls.' Ex. 2 (Asylee Workload and Immigrant Statistics, Fiscal Years 1991–2002).)

224 F.3d 735, 738 (8th Cir.2000). The court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. *See Graves v. Arkansas Dep't of Fin. & Admin.*, 229 F.3d 721, 723 (8th Cir.2000); *Calvit v. Minneapolis Pub. Schs.*, 122 F.3d 1112, 1116 (8th Cir.1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. *See Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir.1995).

## Analysis

Plaintiffs and Defendants have each moved for partial summary judgment on two issues: (1) whether, under 8 U.S.C. § 1159(b), the approximately 22,000 unused refugee admission numbers are available for use at this time; and (2) whether Defendants' practices violate the statutory requirement that asylees be provided with "appropriate endorsement" of their authorization to work. The Court will address each in turn.

## I. Asylee Adjustment

Plaintiffs challenge Defendants' administration of the asylee adjustment process

under the Administrative Procedure Act ("APA"). Under the APA, "A person suffering a legal wrong ... or adversely affected or aggrieved by an agency action ... is entitled to judicial review thereof." 5 U.S.C. § 702. The reviewing court is thus permitted to "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). The reviewing court "shall ... compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

Plaintiffs assert that Defendants have unlawfully withheld agency action by allowing the unused refugee admission numbers set aside for asylee adjustment to lapse at the end of each fiscal year.[9] Plaintiffs argue that neither Congress nor the implementing regulation imposes a limit on when refugee admission numbers, once set aside for adjustment, may be used. Defendants, in contrast, contend that Congress has granted the executive branch wide latitude to administer the asylee adjustment process and that its decision as to the lapsing of refugee admission numbers should be accorded great deference.[10]

The statute neither requires nor expressly forbids the expiration of asylee

9. Plaintiffs also assert–and the undisputed evidence demonstrates–that Defendants have routinely failed to exempt a number of asylees, such as certain Iraqi Kurds, Syrian Jews, and Indochinese parolees, who are statutorily exempt from the 10,000 cap and should therefore be adjusted notwithstanding the asylee adjustment backlog. *See* Pub.L. No. 105–277, Title I, § 128; Pub.L. No. 106–378; Pub.L. No. 106–429, § 586. Defendants' sole defense to this claim is that "INS initiated, and BCIS [Bureau of Citizenship and Immigration Services] continues, a program to purge these exempt individuals from its authorization list." (Ohata Decl. ¶ 18.) Needless to say, the creation of such a program, while laudable, does not establish a defense to prior improper activity. Because Defendants offer no explanation for apparently ignoring Con-

gress's command in this regard, and because each and every class member's place on the waiting list is higher as a result of Defendants' failure to cull exempt asylees from the adjustment rolls, the Court concludes that it constitutes "agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and will therefore enter summary judgment for Plaintiffs on this claim.

10. Defendants also argue that the six-year statute of limitations provided for in 28 U.S.C. § 2401(a) bars Plaintiffs' claims to the extent they rely on acts or omissions that took place prior to March 4, 1996. While § 2401(a) does indeed set forth a six-year limitations period, Plaintiffs' claims do not involve discrete acts, but rather, Defendants' continued refusal to use presently valid asylee adjust-

adjustment numbers. Under 8 U.S.C. § 1159(b), the Attorney General may "ma[k]e available" a certain number of authorized refugee admission numbers for the purpose of asylee adjustment:

Not more than 10,000 of the refugee admissions authorized under section 1157(a) of this title in any fiscal year may be made available by the Attorney General, in the Attorney General's discretion and under such regulations as the Attorney General may prescribe, to adjust the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum....

While this language requires that the set aside be taken from the larger pool of refugee admission numbers "authorized under section 1157(a) of this title *in any fiscal year,*" 8 U.S.C. § 1159(b) (emphasis added), the statute does not require that a refugee admission number, once "authorized" in a given fiscal year, be used for asylee adjustment in that same year. Rather, the statute plainly imposes no temporal limit on the use of asylee adjustment numbers.[11] Where, as here, "the language of the statute is plain, the [Court's] inquiry [begins and] ends with the language of the statute." *United States v. Union Elec. Co.,* 64 F.3d 1152, 1165 (8th Cir.1995).

Likewise, the implementing regulation puts no time limit on the use of refugee admission numbers. Setting forth the "sole and exclusive procedure for adjustment of status by an asylee," 8 C.F.R. § 209.2 merely requires that the asylee have "a refugee number available under [8 U.S.C. § 1159(b) ]" and meet certain other requirements. While the regulation also provides for a waiting list, such a list is only to be established if the applications for adjustment "exceed[ ] the refugee numbers *available* ... for the fiscal year.*" 8 C.F.R. § 209.2(a) (emphasis added). The regulation makes no provision whatsoever for available, but unused, refugee numbers, and therefore presumes that each refugee admission number made available will be used to adjust an asylee. Thus, as with § 1159(b), 8 C.F.R. § 209.2 does not require that admission numbers unused for adjustment expire at the end of each fiscal year.

■ Because the statutory and regulatory authority neither supports nor expressly forbids the lapsing of asylee adjustment numbers, the question becomes whether Defendants nonetheless have the discretionary power to do so. Under § 1159(b), refugee admission numbers shall be made available "in the Attorney

---

ment numbers. As such, Defendants' activity falls squarely within the continuing violations doctrine, *see Walsh v. National Computer Sys., Inc.,* 332 F.3d 1150, 1157 (8th Cir.2003), and Plaintiffs' claims are not time-barred.

**11.** It is noteworthy that Congress used the phrase "in any fiscal year" with regard to the authorization of refugee admission numbers, but omitted it as it pertains to the use of the numbers for asylee adjustment. "[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." *Chicago v. Environmental Def. Fund,* 511 U.S. 328, 338, 114 S.Ct. 1588, 128 L.Ed.2d 302 (1994) (internal quotation marks omitted). Indeed, the Immigration and Na-

tionalization Act as a whole indicates that Congress knew how to limit an applicant's eligibility for an immigration benefit to a particular fiscal year. *See, e.g.,* 8 U.S.C. § 1154(a)(1)(I)(ii)(II) ("Aliens who qualify, through random selection, for a [diversity] visa under section 203(c) *shall remain eligible to receive such visa only through the end of the specific fiscal year* for which they were selected" (emphasis added).). Because the Court "must presume that a legislature says in a statute what it means and means in a statute what it says," *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992), the Court presumes that Congress acted intentionally when it omitted a temporal limit on the use of asylee adjustment numbers.

General's discretion and under such regulations as the Attorney General may prescribe." 8 U.S.C. § 1159(b). Defendants therefore argue that their policy of requiring the expiration of these numbers should be accorded substantial deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[12] The Court disagrees.

Defendants' policy qualifies as neither a regulation itself nor an interpretation of an ambiguous regulation. Rather, it is the sort of sub-regulatory policy, such as "interpretations contained in policy statements, agency manuals, and enforcement guidelines," *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), that is "beyond the *Chevron* pale," *United States v. Mead Corp.*, 533 U.S. 218, 234, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). As such, it is "entitled to respect," *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), "but only to the extent that [it has] the 'power to persuade,'" *Christensen*, 529 U.S. at 587, 120 S.Ct. 1655 (quoting *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161).

■ The Court is not persuaded. Defendants' policy does what neither this Court nor the agency is permitted to do: "add[ ] additional requirements not con-

templated by Congress." *Beltran v. United States Immigration and Naturalization Service*, 332 F.3d 407, 412 (6th Cir. 2003). Defendants' practice of lapsing the set aside "is not a mere interpretation of the statute, but an addendum," *id.*, and Defendants have "no power to either ignore clear congressional intent or amend the legislation," *Hernandez v. Reno*, 91 F.3d 776, 780 (5th Cir.1996), by adding significant temporal restrictions to a statute that is plainly not so limited. Just as "[c]ourts are obligated to refrain from embellishing statutes by inserting language that Congress has opted to omit," *Root v. New Liberty Hospital Dist.*, 209 F.3d 1068, 1070 (8th Cir.2000), so too must Defendants avoid taking away with their practices what Congress has granted by statute. Defendants have no more power to extinguish these numbers than they have to create them.

Defendants have, without statutory or regulatory authority, refused to use over twenty-thousand refugee admission numbers made available for the adjustment of asylees by the President and Congress. Because this constitutes "agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), the Court will grant Plaintiffs' motion with regard to their asylee adjustment claims under the APA.[13]

---

**12.** In their Reply, Defendants argue that the language used by the President to set aside the asylee adjustment numbers should be controlling. For example, in fiscal year 1995, the President ordered "[a]n additional 10,000 refugee admission numbers shall be made available during FY 1996 for the adjustment to permanent resident status under [8 U.S.C. § 1159(b)] of aliens who have been granted asylum in the United States." (Defs.' Ex 2.) Defendants contend that the language "shall be made available during [the applicable fiscal year]," which the President has used every year since 1995, indicates a presidential intent to allow the numbers to lapse at the end of the fiscal year. To the Court's way of

thinking, however, this language mirrors the statute and speaks only to when the numbers are to be made available, not to when they are actually used. Even were Defendants' interpretation of the language the more plausible one, the President's function with regard to setting aside the numbers is strictly ministerial; section 1159(b) does not allow him to set extra-statutory conditions on the use of the numbers by fiat.

**13.** With regard to the remedy, the parties dispute whether "recapture" of the asylee adjustment numbers is appropriate under *Silva v. Bell*, 605 F.2d 978 (7th Cir.1979). This, to the Court, is a non-issue. Because the asylee

## II. Employment Endorsement

### A. Statutory and Regulatory Framework

■ Plaintiffs and Defendants have also filed cross-motions for summary judgment on Plaintiffs' claim that Defendants fail to provide asylees with "appropriate endorsement" of their statutory right to work while in the United States. Under 8 U.S.C. § 1158(c)(1)(B),

> In the case of an alien granted asylum ..., the Attorney General ... shall authorize the alien to engage in employment in the United States and provide the alien with appropriate endorsement of that authorization....

Plaintiffs contend that Defendants' administration of the employment authorization process violates the APA.[14] Defendants largely concede the legal issues,[15] but argue—with only the thinnest of evidentiary support—that they should be immune from summary judgment because they are changing their practices.[16] Defendants are wrong.

Section 1158(c)(1)(B) imposes two statutory requirements. First, Defendants must authorize asylees to engage in employment. Second, they must provide asylees with documents that appropriately reflect *that* authorization. Section 1158(c)(1)(B) contains no words of temporal limitation. In other words, under § 1158(c)(1)(B), asylees must be authorized to work in the United States for as long as they remain asylees. Moreover, under § 1158(c)(1)(B), Defendants must provide documents that reflect that authorization.

adjustment numbers never lapsed or were never properly used, they have been—and continue to be—available for use. In other words, the asylee adjustment numbers are presently available and therefore need not be recaptured. Because the Court must "compel agency action unlawfully withheld," 5 U.S.C. § 706(1), the Court will order Defendants to utilize those numbers.

14. Plaintiffs also argue that Defendants' practices with regard to asylee endorsement violate both the Due Process clause of the Fifth Amendment and § 1158(c)(1)(B) itself. Because the Court finds that Defendants have violated the APA, it need not reach the question of whether that conduct also establishes concurrent due process and statutory violations.

15. In their papers, Defendants admit that (1) they have a statutory duty to provide asylees with endorsement of employment authorization (Defs.' Resp. Mem. at 8), (2) they have no discretion to deny such an endorsement (*id.* at 2–3, 8), (3) their duty to provide an endorsement attaches at the grant of asylum (*id.* at 2), and (4) they must accord all asylees, no matter how they are granted their status, rights and privileges under the same statute (*id.* at 7 n. 13).

16. Defendants insist, and Plaintiffs furiously dispute, that they permit aliens granted asy-

lum by the Executive Office of Immigration Review or by a federal court to receive an I–94 card endorsed with work status. Defendants can point to no written policies and procedures demonstrating that this is so, relying solely on the Declaration of Terrance O'Reilly, Director of the Office of Field Operations, which states: "The [alien granted asylum by the Executive Office of Immigration Review or by a federal court] may also appear at a location determined by the legacy INS District Director to obtain an I–94 card endorsed with evidence of asylum status." (O'Reilly Decl. ¶ 7.) Defendants limply contend that this statement, which was prepared for this litigation and never apparently communicated to anyone, constitutes the Bureau of Citizenship and Immigration Services's "national policy." In rebuttal, Plaintiffs have provided the Court with affidavits indicating that many district offices are apparently unaware of this stealth policy. All of which raises the age-old question: If a national policy falls in the Office of the Director of the Office of Field Operations, and no one hears it, is it still a national policy? The obvious answer is "no." Nonetheless, even taking the O'Reilly Declaration as true, Defendants' practices violate the APA for the reasons stated below.

## B. Endorsement Procedures

In the face of these simple statutory commands, Defendants have established procedures that verge on the Kafkaesque. Defendants provide "no one particular form of an endorsement of employment authorization." (Defs.' Resp. to Pls.' Mem. in Supp. of Second Mot. for Summ. J. at 9.) Rather, the type of document an asylee receives–and the length of time for which it is valid–depends upon the manner in which the asylee was granted asylum and the district office handling the asylee's request.

The primary form of endorsement is the Employment Authorization Document. Prior to the November 10, 2002 effective date of the Border Security Act, asylees were required to apply for an Employment Authorization Document, either in person from the appropriate district office or by filing a form I–765 with the Nebraska Service Center. Under the Border Security Act, however, the Attorney General must now ensure that

> *immediately* upon an alien being granted asylum under section 1158 of this title, the alien will be issued an employment authorization document. Such document shall, at a minimum, contain the fingerprint and photograph of such alien.

Pub.L. 107–173, 116 Stat. 543 (May 14, 2002) (emphasis added). According to this statutory mandate, Defendants now provide an Employment Authorization Document "at or near" the grant of asylum to all aliens granted asylum by an Asylum Officer within the Bureau of Citizenship and Immigration Services. (O'Reilly Decl. ¶ 5.) In contrast, the thousands of aliens granted asylum by the Department of Justice's Executive Office of Immigration Review or by a federal court must still apply for the document, which only issues after an extensive background check. The Employment Authorization Document, no matter how it was obtained, expires every year and must be renewed at the cost of $120. The process takes at least 90 days.

Since litigation began in this matter, Defendants have also begun permitting use of the I–94 card as an endorsement of an asylee's authorization to work. The I–94 card is not, strictly speaking, an employment document. Rather, it is the "Arrival–Departure Record" provided to aliens upon arrival in the United States. Upon the grant of asylum by an Asylum Officer within the Bureau of Citizenship and Immigration Services, the alien's status as an asylee is endorsed upon the card. Should an alien be granted asylum by the Executive Office of Immigration Review or a federal court, however, that alien can only receive an I–94 card by "appear[ing] at a location determined by the legacy INS District Director ... [and] present[ing] evidence of a final grant of asylum." (O'Reilly Decl. ¶ 7.) An endorsed I–94 card issues upon the completion of a background check and verification of status. The length of time for which an I–94 card is valid "v[a]r[ies] from office to office." (Defs.' Resp. to Pls.' Mem. in Supp. of Second Mot. for Summ. J. at 9). Asylees may use the I–94 card as evidence of their authorization to work.

## C. Appropriate Endorsement

While the parties agree that certain allegations in Plaintiffs' Amended Complaint have been rendered moot by changes in Defendants' practices, Defendants continue to violate § 1158(c)(1)(B) in at least two ways. First, Defendants improperly place the onus for obtaining work papers on the thousands of asylees granted asylum by the Executive Office of Immigration Review or by a federal court. Second, Defendants fail to provide all asylees with an endorsement of employment authorization coterminus with status.

### 1. Endorsement Through Application

Defendants must provide each and every asylee with work papers. Moreover, Congress has placed the burden of providing those papers squarely on Defendants' shoulders. Under § 1158(c), the Attorney General *"shall* authorize the alien [granted asylum] to engage in employment in the United States and *provide the alien [granted asylum] with appropriate endorsement."* 8 U.S.C. § 1158(c) (emphasis added). This language is mandatory, and does not permit Defendants to provide work papers only upon request. As the Fifth Circuit noted with regard to the similar language of the Family Unity Provision of the Immigration Act of 1990,

> Congress has unequivocally mandated that eligible immigrants are entitled to .... authorization to be employed in the United States, and ... documentary evidence of that authorization. **The INS regulation requiring an eligible immigrant to apply separately for employment authorization and documentation effectively reads [those] components ... out of the statute.**

This the INS may not do; it has no power to either ignore clear congressional intent or amend the legislation. *Hernandez,* 91 F.3d at 780 (emphasis added).

Defendants ignore "clear congressional intent" by requiring an application from certain classes of asylees.[17] While Defendants properly provide an Employment Authorization Document to asylees granted status by an Asylum Officer (*see* O'Reily Decl. ¶ 6), those granted asylum by the Executive Office of Immigration Review or by a federal court must still, on their own initiative, seek out appropriate endorsement (*see id.* ¶ 7). Not only is there no statutory justification for this differential treatment, but the application requirement in and of itself "effectively reads [Defendants' obligation] ... out of the statute." *Hernandez,* 91 F.3d at 780. Defendants are required to provide appropriate endorsement to *all* asylees, regardless of how asylum was granted. Defendants' practice, arbitrary in the extreme, is "not in accordance with law." 5 U.S.C. § 706(2)(A). The Court will therefore grant Plaintiffs' motion with regard to this issue.[18]

**17.** Accordingly, 8 C.F.R. § 274a.13(a) and 8 C.F.R. § 274a.12(a)(5), to the extent they require that asylees affirmatively apply for employment authorization documents, are entitled to no deference. *See Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

**18.** Under the Border Security Act, Defendants' obligation with regard to work papers is even clearer. The Border Security Act now requires the Attorney General to issue an employment authorization document, complete with a photo and fingerprint, *"immediately* upon an alien being granted asylum." Pub.L. 107–173, 116 Stat. 543 (May 14, 2002) (emphasis added). Despite this statutory guidance, however, Defendants continue to impose a delay on those asylees granted asylum by the Executive Office of Immigration Re-

view or a federal court, requiring that they submit an application and undergo a rigorous background check before an endorsement will issue. This strikes the Court as particularly odd because, as Defendants admit, "the Attorney General has no discretion to withhold employment authorization [or presumably the endorsement] once an individual is granted asylum." (Carpenter Memorandum at 7.) To the extent, therefore, that Defendants continue to delay providing an endorsement to these asylees after the grant of asylum–even for background checks–they contravene the expressly stated will of Congress. *Compare* Pub.L. 107–173, 116 Stat. 543 (May 14, 2002) (requiring the issuance of employment authorization documents "immediately"), *with* Decl. of Terrance O'Reilly, Director of the Office of Field Operations, Bureau of Citizenship and Immigration Services, ¶ 5 (stating that the Bureau of Citizenship and Immigration Services now provides an endorsement "at or *near"* the grant of asylum (emphasis

## 2. Endorsement Expiration

Defendants also violate § 1158(c)(1)(B) by not providing asylees with work papers coterminus with status. Under § 1158(c)(1)(B), asylees are authorized to work for as long as they are asylees, and Defendants must provide "appropriate endorsement of *that* authorization." 8 U.S.C. § 1158(c)(1)(B) (emphasis added); *see also* 8 C.F.R. § 274a.12(a) (authorizing asylee employment "incident to status"). Defendants have no discretion to deny an asylee either employment authorization or appropriate work papers. By imposing the arbitrary and varied validity periods of these documents, however, Defendants do exactly that.

Defendants offer no statutory or regulatory rationale for the expiration of these documents, which Defendant Director Aguirre himself has called a "self-imposed and unnecessary" requirement. (Pls.' Ex. 4 (Prepared Remarks of Eduardo Aguirre, Director, U.S. Citizenship and Immigration Services (Migration Policy Institute, Sept. 3, 2003)).) Defendants concede that "there is no authority under regulations" for the limited validity period. (Prelim. Tr. of Oral Argument at 38.) Indeed, with regard to the Employment Authorization Document, Defendants' sole justification is that "current machines do not allow for manufacture of a card with a validity period of longer than one year."[19] (O'Reilly Decl. ¶ 5.) While the Court is tempted to pause and reflect upon the grim, futurist implications of this statement, it should suffice to say that our Constitution provides for government under the rule of law, not machines, and when the two conflict, the machines must give way. Defendants fare little better with the I–94 card. With periods of validity that vary according to the whim of each local office, the I–94 card provides another example of Defendants' one-law-for-Tuesdays-and-another-law-for-Wednesdays mismanagement of the asylee endorsement process, and paints the very picture of arbitrary and capricious agency action.

In short, and to put it mildly, Defendants have botched their obligation to provide appropriate endorsement of asylees' authorization to work. Not only have Plaintiffs demonstrated clear APA violations, but Defendants' violations are so widespread, so egregious, and so plainly harmful to asylees as a class as to constitute nothing short of a national embarrassment. Under § 1158(c)(1)(B) and 8 C.F.R. § 274a.12(a), appropriate endorsement of an asylee's authorization to work should last for as long as that alien remains an asylee–not a minute shorter, and not a minute longer. By failing to provide such an endorsement, Defendants have "unlawfully withheld [and] unreasonably delayed" agency action in violation of the APA. 5 U.S.C. § 706(1). Accordingly, the Court will grant Plaintiffs' motion with regard to their asylee endorsement claim.

---

added)). Of course, under both § 1158(c)(1)(B) and the Border Security Act, background checks could properly occur before the grant of asylum.

**19.** In Oral Argument, counsel from the Department of Justice stated that "the machines that produce some of the cards, the cards actually do disintegrate after a year. That's the type of paper that they used." (Prelim. Tr. Oral Arg. at 38.) When pressed for additional reasons that might support this practice, counsel advanced, in essence, the administrative corollary to Newton's First Law of Motion; namely, that a policy in place tends to stay in place, even if no one can remember the reason it was first established. As stated by counsel: "[T]he individuals who made the decision about them expiring in a year are perhaps no longer with the Department of Homeland Security, so it's unclear why they decided to make them expire after one year." (*Id.* at 38.)

## Conclusion

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS ORDERED**:

1. Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 57) is **GRANTED**;

    a. Under 28 U.S.C. § 2201, the Court **DECLARES**, as a matter of law, that all refugee admission numbers that have been made available for asylee adjustments in prior years but remain unused are presently available to be used for asylee adjustment;

    b. Defendants shall make an accounting of the precise number of asylee adjustment numbers made available by the President but not used by Defendants in each fiscal year since 1992;

    c. Defendants shall make an accounting of the precise number of asylee adjustment numbers made available by the President that were erroneously used to adjust the status of asylees subject to statutory exemptions, including certain Iraqi Kurds, Syrian Jews, and asylees who applied for asylum prior to 1990. *See, e.g.,* Pub.L. No. 105–277, Title I, § 128; Pub.L. No. 106–378; Pub.L. No. 106–429, § 586; and

    d. Defendants shall use all unused and misused asylee adjustment numbers made available in prior years to adjust the status of asylees, beginning at the start of the waiting list;

        i. The parties shall attempt to negotiate a schedule for the timely and expedient use of these numbers;

        ii. Should the parties fail to negotiate a schedule for the timely and expedient use of these numbers within sixty (60) days from the effective date of this Order, the Court will establish a schedule; and

        iii. Defendants' use of these numbers is to be in addition to the use of any numbers that have been or will be made available in fiscal year 2004 or in subsequent years;

2. Defendants' Cross–Motion to Dismiss, in Part, or, in the Alternative, for Partial Summary Judgment and in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 50) is **DENIED**;

3. Plaintiffs' Second Motion for Partial Summary Judgment (Doc. No. 68) is **GRANTED**;

    a. Under 28 U.S.C. § 2201, the Court **DECLARES** that Defendants have a statutory duty under both 8 U.S.C. § 1158(c)(1) and Pub.L. 107–173, 116 Stat. 543 (May 14, 2002) to provide, on their own initiative, endorsement of employment authorization to *all* asylees immediately upon the grant of asylum. Defendants have no discretion to deny such an endorsement. Such endorsement

        i. must contain, at a minimum, the fingerprint and photograph of the asylee; and

        ii. be continuously valid for the duration of the alien's status as an asylee.

    b. Defendants shall provide all asylees with an employment authorization endorsement that is valid throughout the duration of the alien's status as an asylee;

        i. The parties shall attempt to negotiate a deadline for the issuance of this endorsement; and

ii. Should the parties prove unable to reach an agreement within sixty (60) days from the effective date of this Order, the Court will establish a deadline;

4. Defendants' Motion for Partial Summary Judgment (Doc. No. 75) is **DENIED**;

5. This Order is **STAYED** until the time for appealing therefrom has expired, and, if an appeal is taken, the stay is continued throughout the pendency of the appeal; and

6. Pursuant to Fed.R.Civ.P. 54(b), the Court determines that there is no just reason for delaying the entry of judgment on these claims. The Clerk of Court is expressly directed to enter judgment pursuant to this Order.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**