**Shmul KAPLAN, et al., Plaintiffs,**

v.

**Michael CHERTOFF, et al., Defendants.**

**Civil Action No. 06–5304.**

United States District Court, E.D. Pennsylvania.

March 29, 2007.

As Amended April 16, 2007.

Ayodele A. Gansallo, Hias and Council Migration Service of Philadelphia, Jonathan M. Stein, Michael R. Froehlich, Richard P. Weishaupt, Community Legal Services, Inc., Jordana L. Greenwald, Sabrina M. Rudnick, Thomas B. Roberts, Ballard, Spahr, Andrews & Ingersoll, LLP, Philadelphia, PA, John Bouman, Chicago, IL, for Plaintiffs.

Elizabeth J. Stevens, US Dept. of Justice, Washington, DC, Richard M. Bernstein, U.S. Attorney's Office, Philadelphia, PA, for Defendants.

MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION .................................................376

II. BACKGROUND ..................................................377
 A. Social Security Benefits for Humanitarian Refugees .........................377
 B. Procedure for Humanitarian Immigrants to Become United States
 Citizens.................................................378
 C. Delays in the LPR and Naturalization Process ...........................379
 1. Delays for Refugees .............................................379
 2. Delays for Asylees.................................................379

 D. Alleged Inadequacy of Existing CIS and FBI Policies......................380
 E. Termination of Benefits.............................................380

III. JURISDICTION.........................................................380
 A. Plaintiffs Have "Presented" Claims for Continued Enrollment in the SSI
 Program.........................................................381
 B. No Practical Purpose Would Be Served By Exhausting Administrative
 Remedies.........................................................381
 1. Plaintiffs' claims are collateral to their claim for benefits..................382
 2. Plaintiffs have made out a colorable showing of irreparable harm .........382
 3. Requiring Plaintiffs to exhaust administrative remedies would be
 futile.........................................................383

IV. THE MERITS .........................................................384
 A. Plaintiffs' Due Process Claim ..........................................384
 1. The Welfare Reform Act's Plain Language...............................384
 2. The Framework for Statutory Construction ..............................384
 (a) The plain language of the statute supports a finding that the time
 limitation is a substantive element of eligibility.....................384
 (b) An examination of relevant legislative history also supports a
 finding that the time limitation is a substantive element of
 eligibility ...................................................384
 (i) Congressional policy with respect to welfare and
 immigration ............................................386
 (ii) Congress addressed the problem facing Plaintiffs and chose
 not to indefinitely extend SSI benefits......................387
 2. The cases relied upon by Plaintiffs are distinguishable....................389
 3. Plaintiffs do not have an entitlement to the procedures for applying
 for LPR status or naturalization ....................................390
 4. Conclusion.......................................................391
 B. Plaintiffs' Equal Protection Claim ......................................391
 1. The Standard of Review for Equal Protection ...........................392
 (a) Disparate treatment claims require intent to Discriminate............392
 (b) Intra–Alien classifications warrant only rational basis review.........393
 2. Plaintiffs have stated a claim for violation of the Equal Protection
 Clause .........................................................395
 (a) Unequal treatment as a result of unintended backlogs does not
 violate equal protection .......................................395
 (b) Intentional and arbitrary implementation of the expedited policy
 constitutes a violation of equal protection.........................396
 (i) Plaintiffs have alleged an intentional decision by CIS............396
 (ii) Plaintiffs have alleged CIS's decision to expedite is based on
 an arbitrary factor........................................396
 C. Plaintiffs' Claims Under the APA ......................................398
 1. Plaintiffs State an APA Claim Against CIS ............................399
 2. Plaintiffs State an APA Claim Against the FBI.........................400
 3. Whether Alleged FBI Delays Are Attributable to CIS....................401
 D. Issue Preclusion .....................................................402
 1. The Ngwanyia Case ..............................................402
 2. Issue preclusion applies only where an issue was necessary to the
 adjudication of a prior case ........................................403
 3. None of the issues necessary to the adjudication of Ngwanyia are
 identical to issues in this case .....................................404

V. CONCLUSION .........................................................404

## I. INTRODUCTION

Before the Court is a claim by humanitarian refugees and asylees that they are entitled to continue to receive supplemental security income ("SSI") benefits beyond the seven-year limit set by Congress.

The case raises substantial issues of national policy. On the one hand, Plaintiffs' claims implicate a core belief that America continues to be a welcoming home for the "huddled masses" escaping the horror of tyranny. On the other hand, the claims also raise issues of domestic social policy and the allocation of governmental resources among competing populations in need. Which branch of government gets to decide the issue, what process is used to decide it, and the ultimate outcome of the case all say much about the American legal and political system in the dawn of the 21st Century.

Plaintiffs in this case are a proposed class of some 50,000 refugees and asylees who have lost or are at risk of losing their SSI benefits as a result of alleged delays in their applications for legal permanent residency ("LPR") status and naturalization.[1] These humanitarian immigrants, like any United States citizen, qualify for SSI benefits if they are impoverished and either elderly, disabled, or blind. *See* 42 U.S.C. §§ 1381 et seq. However, unlike United States citizens, their eligibility for SSI benefits is limited to a seven-year period. *See* 8 U.S.C. § 1612(a)(2). Plaintiffs are humanitarian immigrants who qualify for SSI benefits but have had those benefits subject to termination because of the expiration of the seven-year period of eligibility. Plaintiffs maintain these terminations are unlawful because they result from administrative delays in the processing of their applications for naturalization.

Plaintiffs allege that typical members of the proposed class are Russian Jews and other religious minorities who fled the former Soviet Union, Iraqi Kurds who fled persecution under the Saddam Hussein regime, Cubans fleeing the Castro regime, Hmong immigrants from the highlands of Laos who served on the side of the U.S. military during the Vietnam war, persecuted minorities in Somalia, and persons from various regions of the former Yugoslavia displaced by the Balkan wars. Plaintiffs allege that the termination of SSI benefits puts their very survival at stake, as they receive SSI benefits because they are all both impoverished and either disabled, blind, or elderly.

For example, Shmul Kaplan, the first named plaintiff in the case, is an 80–year old Holocaust survivor. His disabilities include an amputated right leg and a badly fractured and deformed left leg. Mr. Kaplan was persecuted in the former Soviet Union because of his Jewish religion. He entered the United States in 1996 and was granted asylum the following year. In 1998, he applied for LPR status, but Defendants did not rule on his application until September 2003, five years later. Because he was not able to obtain American citizenship within seven years, the Social Security Administration ("SSA") terminated his SSI benefits in 2004. Mr. Kaplan cannot even apply for naturalization until June 2007, over ten years after

---

1. The Social Security Administration ("SSA") estimates that between 1998 and 2005 it terminated the SSI benefits of 5,662 members of the proposed class. The SSA further estimates that approximately 4,500 more will lose SSI benefits in fiscal year 2007. Each year thereafter, the SSA estimates that approximately 4,000 humanitarian immigrants will lose SSI benefits. Overall, the SSA acknowledges that 46,780 SSI recipients are at risk of losing benefits due to the expiration of the seven-year eligibility period between 2006 and 2012. Pls.' Brf. at 2 (citing Freedom of Information Act (FOIA) Response of Willie J. Polk, SSA (Oct. 20, 2006), Tab A, Ex. 14 of Pls.' Mot. for Preliminary Injunction).

he was granted asylum, and well past the expiration of his seven-year eligibility for SSI benefits.

Plaintiffs bring essentially two actions in this matter. The first is against the SSA, claiming that Plaintiffs are entitled to continue receiving SSI benefits even after the seven-year period of eligibility has expired. In the first action, Plaintiffs argue that the SSA has deprived them of their entitlement to SSI benefits without affording due process. Through this first action, Plaintiffs seek restoration of their SSI benefits and an injunction prohibiting further termination of SSI benefits to humanitarian immigrants.

Plaintiffs bring the second action against the Department of Homeland Security's Citizenship and Immigration Services ("CIS") and the Federal Bureau of Investigation ("FBI"). In the second action, Plaintiffs allege that there are procedural deficiencies in the processing of their applications for naturalization. They assert that the different timeliness in the processing of humanitarian immigrants' applications violates the Equal Protection Clause. They also assert that CIS and the FBI have unreasonably delayed the processing of their applications, in violation of the Administrative Procedure Act ("APA"). Through this second action, Plaintiffs seek an injunction compelling the defendants to timely process their applications and other declaratory relief.

Defendants move to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) (doc. no. 22). Given the importance of the issues raised by Plaintiffs and the claims of irreparable harm, the Court has considered the case on an expedited briefing schedule.[2]

As set forth in more detail below, the Court will grant Defendants' motion as to Plaintiffs' first action, but deny the motion as to the second action. The Court finds it has jurisdiction to hear the first action against the SSA, as it is appropriate to waive the requirement that Plaintiffs exhaust their administrative remedies. Plaintiffs' due process claim, however, must be dismissed because Plaintiffs do not have a property interest in any SSI benefits after the seven-year limitation imposed by Congress. As to the second action, on the other hand, Plaintiffs have stated two viable claims. First, they have stated a claim under the Equal Protection Clause based on their allegations that different applicants receive different treatment because of CIS's arbitrary implementation of an expedition policy. Second, Plaintiffs have stated a valid claim of unreasonable delay against CIS and the FBI under the APA. Finally, the Court finds that the APA claim against CIS and the FBI is not precluded by a settlement in a prior case.

## II. BACKGROUND

### A. Social Security Benefits for Humanitarian Refugees

As a general rule, aliens are not eligible for SSI benefits. 8 U.S.C. § 1612(a)(1).

---

**2.** Plaintiffs filed the Complaint in this case on December 6, 2006 (doc. no. 3) and served Defendants the next day (doc. no. 4). Plaintiffs then filed motions for a preliminary injunction and class certification on January 31, 2007 (doc. nos. 7, 8). The Court held a status and scheduling conference on February 9, 2007, in which it ordered Defendants to file a motion to dismiss by February 14, 2007, Plaintiffs to respond by February 21, 2007, and Defendants to file any reply by February 28, 2007 (doc. no. 21). The Court heard oral argument on the motion to dismiss on March 7, 2007. This Memorandum follows the Court's Order of March 7, 2007 (doc. no. 34), in which the Court indicated it would issue a memorandum deciding the merits of Defendants' motion and explain its reasoning for that decision.

Congress has carved out, however, certain exceptions to this general rule. One such exception applies to refugees, asylees, Amerasians,[3] and Cuban and Haitian entrants.[4] 8 U.S.C. § 1612(a)(2)(A). These humanitarian immigrants are eligible to receive SSI benefits for seven years: from the date of entry for refugees and Amerasians, and from the date of the grant of protected status for asylees and Cuban or Haitian entrants. *See* 8 U.S.C. § 1612(a)(2)(A).

Of course, if humanitarian immigrants obtain American citizenship before the applicable seven-year limitation expires, and are otherwise still eligible, then they can continue to receive SSI benefits just like any other American citizen. In such case, the seven-year limitation no longer applies. However, if they do not receive citizenship, their SSI benefits are terminated at the end of the applicable seven-year period.

B. *Procedure for Humanitarian Immigrants to Become United States Citizens*

For humanitarian immigrants, obtaining citizenship is a two-step process. First, they must apply for and become an LPR. Refugees may apply for LPR status after residing in the United States for one year as a refugee. 8 C.F.R. § 209.1(a)(1). Asylees may apply for LPR status one year after a final grant of asylum status. 8 C.F.R. § 209.2(a)(1)(ii). Cuban and Haitian entrants may apply for LPR status after residing in the United States for one year as a parolee. *See* Pub.L. No. 89–732,

80 Stat. 1161 (Nov 2, 1966), as amended; Pub.L. No. 105–277, 112 Stat. 2681 (Oct. 21, 1998), as amended. Amerasians are admitted with LPR status. Pub.L. No. 100–202, 101 Stat. 1329 (Dec. 22, 1987), as amended.

Second, humanitarian immigrants must apply for naturalization. All classes of immigrants must wait until ninety days prior to the five-year anniversary of the effective date of their becoming LPRs before they may apply for naturalization. 8 U.S.C. § 1445(a)-(b); 8 C.F.R. §§ 316.4, 334.1, 334.2. Put another way, after receiving LPR status, an immigrant must wait four years and nine months before applying for naturalization.

The effective date for calculating the four-year and nine-month waiting period for naturalization is calculated differently for different immigrant classifications. The effective date of a refugee's LPR status is backdated to the date of entry into the United States. 8 C.F.R. § 209.1(e). Accordingly, refugees with LPR status may apply for naturalization four years and nine months after *entry into the United States.* Amerasians are admitted with LPR status. Like refugees, therefore, they can apply for naturalization four years and nine months after entry. The effective date for asylees, on the other hand, is backdated to no more than one year before the *grant of LPR status.* 8 C.F.R. § 209.2(f). Thus, if an asylee enters the United States and does not receive LPR status until three years after

---

**3.** Congress enacted the Amerasian Act in 1982, Pub.L. No. 97–359, to address the situation of individuals fathered abroad by U.S. servicemen to women of Asian nationalities during World War II and the Korean War. The Amerasian Act provides for the immigration to the United States of such "Amerasian children." To qualify as an Amerasian, an alien must have been born in Cambodia, Korea, Laos, Thailand, or Vietnam after Decem-

ber 31, 1950, and before October 22, 1982, and have been fathered by a U.S. citizen. *See* 8 C.F.R. § 204.4.

**4.** Section 501(e) of the Refugee Education Assistance Act of 1980 defines when an alien may be granted status as a Cuban or Haitian entrant and consequently receive certain benefits. 8 U.S.C. § 1522.

entry, she must wait six years and nine months before applying for naturalization.

Once a humanitarian immigrant applies for naturalization, the sole authority to naturalize that immigrant as a citizen of the United States lies with the Secretary of Homeland Security. 8 U.S.C. §§ 1103(a), 1421(a). An LPR seeking naturalization bears the burden of proving his eligibility to receive citizenship by establishing residency; an understanding of the English language and the history, principles, and form of government of the United States; and good moral character. *See* 8 U.S.C. §§ 1423, 1427(a) & (e), 1429; 8 C.F.R. §§ 316.5, 316.10.

In 1997, Congress for the first time required completion of a full criminal background investigation by the FBI[5] as part of the inquiry into an applicant's "moral character," before CIS could confer citizenship by naturalization. Pub.L. No. 105–119, 111 Stat. 2448.[6] To give effect to this congressional mandate, CIS adopted a regulation that it will not begin any naturalization examination until receipt of the FBI's final report of its full background check. *See* 8 C.F.R. § 335.2(b).

### C. *Delays in the LPR and Naturalization Process*

Plaintiffs bring this case because a huge backlog of unprocessed applications has built up at CIS, resulting in the termination of their SSI benefits before CIS can consider or decide their applications. The parties agree this problem results from the increased volume of applications, particularly the large volume of applications to adjust humanitarian immigrants' status to LPR and applications for naturalization. The parties also agree that another significant component of the backlog is the time taken by the FBI in processing background checks through its National Name Check Program.

#### 1. *Delays for Refugees*

Delays at the LPR and naturalization stages can push refugees past the seven-year period of eligibility in two ways. First, if the LPR application takes more than three years and nine months to be processed, the time when the refugee may file her naturalization application will be postponed, giving the CIS and FBI scant time to process her naturalization application before expiration of the seven-year eligibility. Second, even if a refugee can timely file a naturalization application, CIS and the FBI often take significantly more than two years to process naturalization applications.

#### 2. *Delays for Asylees*

Asylees are at a greater risk of being terminated because the effective date of their LPR status is only backdated to one year prior of the grant of LPR status, although the seven-year eligibility period starts to run from the grant of asylum. Accordingly, if it takes CIS three years and three months to process an LPR application that was promptly filed one year after the grant of asylum, an asylee cannot even apply for naturalization until the seventh anniversary of the grant of asylum, when SSI benefits will already be subject to termination.

---

**5.** The requisite FBI investigation consists of a fingerprint check and a name check. 8 U.S.C. § 1446(a); 8 C.F.R. § 335.1.

**6.** Specifically, Congress mandated "[t]hat during fiscal year 1998 and each fiscal year thereafter, none of the funds appropriated or otherwise made available to the Immigration and Naturalization Service shall be used to complete adjudication of an application for naturalization unless the Immigration and Naturalization Service has received confirmation from the Federal Bureau of Investigation that a full criminal background check has been completed." Pub.L. 105–119, Tit. I, Nov. 26, 1997, 111 Stat. 2448.

## D. *Alleged Inadequacy of Existing CIS and FBI Policies*

As a general matter, CIS processes applications by date of filing: a first-come, first-served system. 8 C.F.R. § 209.2(a)(1); INS Operations Instructions OI 103.2(q). Under this system, applicants must wait years before their application comes to the top of the pile and receives consideration. Plaintiffs allege that, in light of the consequences that such backlogs cause to humanitarian immigrants receiving SSI benefits, CIS and the FBI's method of processing applications is inadequate and unreasonable.

Plaintiffs acknowledge that CIS claims to make exceptions to the first-come, first-served procedure upon a showing of "emergent circumstances." INS Operations Instructions OI 103.2(q). Moreover, Plaintiffs acknowledge that CIS claims to have an expedition policy targeted at the applications of SSI recipients. Specifically, INS Operations Memorandum 22 states that "due to increasing naturalization application receipts and current naturalization processing times, many, if not most [LPRs receiving SSI benefits], will not be able to complete the naturalization process before the termination of benefits." INS Operations Memorandum 22, p. 2 (Oct. 6, 1997), Ex. 18 to Pls.' Mot. for P.I. ("Memorandum 22"). Memorandum 22 directs that such applicants should be given priority in processing.

Plaintiffs maintain, however, that Memorandum 22 is ineffective for two reasons. First, allegedly, the policy is not widely known by the applicants. CIS does not inform immigrant service agencies, the public, or SSI recipients of its existence. Nor is Memorandum 22 published in the Federal Register or codified in the Code of Federal Regulations. Second, even when the policy is invoked by an applicant, Plaintiffs allege that CIS implements it unevenly, honoring some expedite requests while ignoring others.[7]

## E. *Termination of Benefits*

The SSA issues a yearly reminder notice to humanitarian immigrants receiving SSI benefits indicating when their eligibility period began and that it will end seven years from that date. At the end of the seven-year period, the benefits are automatically terminated.[8]

## III. JURISDICTION

Defendants challenge the Court's jurisdiction over the SSA, arguing that Plaintiffs have failed to exhaust administrative remedies. Plaintiffs argue that requiring them to exhaust their administrative remedies in this case would be impractical and futile. As such, according to Plaintiffs, exhaustion is not required.

Jurisdiction over claims to SSI benefits is provided under the Social Security Act, which states that "[a]ny individual, after any *final decision* of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ...." 42 U.S.C. § 405(g) (emphasis added). The requirement in Section 405(g) that there be a final decision:

---

**7.** Plaintiffs Lidia Burtseva and Nelli Olevskaya allege they requested that CIS expedite their naturalization applications. They claim, however, that their requests were never acknowledged or even entered into their files.

**8.** The SSA first notifies humanitarian immigrants that their SSI benefits are being suspended and explains that they have a certain amount of time to request reconsideration and further appeal of the suspension. *See* 20 C.F.R. § 416.1400(a)(2). At the end of that time period, the SSA then terminates the benefits.

consists of two elements, only one of which is purely "jurisdictional" in the sense that it cannot be "waived" by the Secretary in a particular case. The waivable element is the requirement that the administrative remedies prescribed by the Secretary be exhausted. The nonwaivable element is the requirement that a claim for benefits shall have been presented to the Secretary.

*Mathews v. Eldridge,* 424 U.S. 319, 328, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *see also Fitzgerald v. Apfel,* 148 F.3d 232, 234 (3d Cir.1998).

A. *Plaintiffs Have "Presented" Claims for Continued Enrollment in the SSI Program.*

 The presentment requirement has been interpreted "liberally." *Linquist v. Bowen,* 813 F.2d 884, 887 (8th Cir.1987); *Morrell v. Harris,* 505 F.Supp. 1063, 1068 (E.D.Pa.1981). For example, in *Liberty Alliance of the Blind v. Califano,* the Third Circuit considered the government's interpretation of a Social Security Act provision that grandfathered into the SSI program a class of blind individuals. 568 F.2d 333 (3d Cir.1977). In considering whether jurisdiction was appropriate, the Third Circuit determined that the presentment requirement had been met because "all the plaintiffs are Supplemental Security Income recipients whose benefits have been reduced or terminated." *Id.* at 344.

The Third Circuit reiterated *Liberty Alliance's* liberal interpretation of the presentment requirement in *Kuehner v. Schweiker,* 717 F.2d 813, 817–18 (3d Cir. 1983), *superseded by statute and vacated,* 469 U.S. 977, 105 S.Ct. 376, 83 L.Ed.2d 312 (1984). In *Kuehner,* a class of Pennsylvania residents receiving SSI benefits who had "been notified that those benefits have been or are about to be terminated,"[9] alleged that the SSA used the wrong medical standard when terminating their benefits. The plaintiffs sought declaratory and injunctive relief preventing the SSA from continued use of the wrong standard. The district court dismissed for lack of jurisdiction, finding the plaintiffs had not exhausted their administrative remedies. The Third Circuit, however, reversed because, as in *Liberty Alliance,* "all the claimants were benefit recipients whose benefits had been reduced or terminated." *Id.* at 817.[10]

Like the plaintiffs in *Liberty Alliance* and *Kuehner,* Plaintiffs here have met the presentment requirement. They have previously established entitlement to SSI benefits, which entitlement has been or is at risk of being terminated.[11]

B. *No Practical Purpose Would Be Served By Exhausting Administrative Remedies.*

The general requirement that plaintiffs exhaust administrative remedies before seeking judicial review is intended to pro-

---

**9.** *Kuehner* demonstrates that *Liberty Alliance's* holding extends not only to SSI recipients whose benefits have already been terminated, but also to recipients at risk of having their benefits terminated.

**10.** In response to numerous cases being litigated throughout the country regarding the same substantive issue underlying *Kuehner,* Congress passed legislation to provide relief to persons whose SSI benefits had been terminated because of the SSA's use of the wrong standard. As a consequence, *Kuehner* was vacated and remanded for the lower

courts to apply the new legislation. *Heckler v. Kuehner,* 469 U.S. 977, 105 S.Ct. 376, 83 L.Ed.2d 312 (1984).

**11.** Even more technical approaches to the presentment requirement have been liberally applied. For example in *Mathews v. Diaz,* the Supreme Court found the presentment requirement satisfied based on an affidavit and stipulation attesting to the fact that an application for benefits had been filed, even though the plaintiff did not file the application until after the filing of the complaint. 426 U.S. 67, 75, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976).

mote efficiency in the administrative process:

Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

*Weinberger v. Salfi,* 422 U.S. 749, 765, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). There is no need to apply the exhaustion requirement when doing so would not promote such efficiency. As the Supreme Court has explained:

The ultimate decision of whether to waive exhaustion should not be made solely by mechanical application of the *Eldridge* factors, but should also be guided by the policies underlying the exhaustion requirement. The purposes of exhaustion would not be served by requiring these class members to exhaust administrative remedies. This case is materially distinguishable from one in which a claimant sues in district court, alleging mere deviation from the applicable regulations in his particular administrative proceeding.... These claimants stand on a different footing from one arguing merely that an agency incorrectly applied its regulation.... Nor did this policy depend on the particular facts of the case before it; rather, the policy was illegal precisely because it ignored those facts.

*Bowen v. New York,* 476 U.S. 467, 485, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986).

■ The Third Circuit has also noted "the practical considerations militating against the requirement that claimants go through the motions of administrative review when a court is addressing a claim that the agency applies an illegal standard." *Bailey v. Sullivan,* 885 F.2d 52, 65 (3d Cir.1989). These practical considerations provide the overriding framework as courts consider the three factors that are balanced in carrying out the exhaustion analysis: (1) whether the claims are collateral to a claim for benefits; (2) whether exhaustion will result in a colorable showing of irreparable harm; and (3) whether exhaustion would be futile. *Id.* at 64.

1. *Plaintiffs' claims are collateral to their claim for benefits.*

"[C]laims of systemwide misapplication or invalidity are collateral to the claims for individual benefits." *Bailey,* 885 F.2d at 65. In the social security context, the clearest example of cases in which plaintiffs' claims are collateral to their claims for individual benefits are those in which plaintiffs present constitutional issues. "Constitutional questions obviously are unsuited to resolution in administrative hearing procedures and, therefore, access to the courts is essential to the decision of such questions." *Califano v. Sanders,* 430 U.S. 99, 109, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

■ Here, Plaintiffs seek not just to adjudicate the merits of their individual requests for SSI benefits. Rather, more ambitiously, they seek to correct how federal agencies are implementing a statute nationwide. Plaintiffs seek constitutional remedies under the Due Process and Equal Protection Clauses, as well as the provisions of the APA. Because the award of individual benefits through a determination of eligibility is not the subject of this lawsuit, Plaintiffs claims are collateral to their claim for benefits.

2. *Plaintiffs have made out a colorable showing of irreparable harm.*

In previous Social Security cases, the Third Circuit "has found that the fact that

claimants have severe mental or physical conditions and few resources other than the requested benefits justifies a finding of irreparable harm and a waiver of the exhaustion requirement." *Bailey*, 885 F.2d at 65 (citing *Wilkerson v. Bowen*, 828 F.2d 117, 121–22 (3d Cir.1987)). The Supreme Court has also noted that in certain instances "[t]he ordeal of having to go through the administrative appeal process" may also contribute to the irreparable harm. *Bowen*, 476 U.S. at 483–84, 106 S.Ct. 2022.

■ In this case, all plaintiffs are, by definition, impoverished and elderly, blind or disabled. To deprive them of continuing SSI benefits will significantly affect their health. Requiring them to exhaust administrative remedies while deprived of their subsistence income is simply not practical. Hence, Plaintiffs have demonstrated a colorable showing of irreparable harm.

3. *Requiring Plaintiffs to exhaust administrative remedies would be futile.*

There is no reason to believe that if Plaintiffs appealed their claims for continuation of their SSI benefits through the administrative process that they would achieve any success. Thus, exhaustion would be futile. This conclusion is true for three reasons.

■ First, Plaintiffs present claims involving constitutional questions, and a "constitutional question is beyond the Secretary's competence." *Mathews v. Diaz*, 426 U.S. 67, 76, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). In cases that present questions of constitutional law, the Supreme Court has waived the administrative exhaustion requirement. *See id.; Salfi*, 422 U.S. at 765, 95 S.Ct. 2457.

Second, the SSA has considered and acted on Plaintiffs' claims and has arrived at a final position regarding those claims.

The SSA has established procedures for humanitarian immigrants to challenge the termination of their SSI benefits due to the expiration of the seven-year limitation. *See* SSA–POMS § SI 00502.106.C.3.a, Ex. 15 to Pls.' Mot. for Prel. Inj. Those procedures only allow an SSA officer to evaluate a challenge based on United States residency on August 20, 1996, or lawful presence in the United States on August 22, 1996. They do not allow the officer to continue SSI benefits based on the claims Plaintiffs bring in this case. *See id.*

In *Liberty Alliance*, the class members had filed claims with the SSA and, although it had not "finally passed on each of those claims, [the SSA had] taken a final position in one of them ... at the highest administrative level, on a legal issue common to all of the class members." 568 F.2d at 344. Defendants have argued that they should be given a similar chance here to make a decision at the highest administrative level. Although it is true that no Plaintiff in this action has individually exhausted administrative remedies at the highest level, the SSA's own procedures demonstrate that the SSA has taken a "final position" with respect to Plaintiffs' eligibility. Moreover, as in *Liberty Alliance*, the "instant suit was not filed until ... negotiations between [Plaintiffs' attorneys] and the Social Security Administration over the proper interpretation of [the Welfare Reform Act] had proven fruitless." *See id.*

Third, it is doubtful that the SSA would change its final position through the administrative review process, which was designed to consider the denial of *individual* SSI claims. As the Supreme Court observed thirty years ago in similarly rejecting the need for a claimant to raise an issue in the administrative process: "It is unrealistic to expect that the Secretary would consider substantial changes in the current administrative review system at

the behest of a single aid recipient raising a constitutional challenge in an adjudicatory context. The Secretary would not be required even to consider such a challenge." *Eldridge,* 424 U.S. at 330, 96 S.Ct. 893.

Thus, the Court will proceed to examine the merits of the motion to dismiss.[12]

## IV. THE MERITS

Plaintiffs claim that the Defendants' actions violate the Due Process and Equal Protection Clause of the United States Constitution as well as the APA. The Court will consider these claims seriatim.

### A. *Plaintiffs' Due Process Claim*

It is well established that the Constitution prohibits the deprivation of a property right without due process of law. *Bd. of Regents of State Coll. v. Roth,* 408 U.S. 564, 576–78, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Property rights are not created by the Constitution but must be located in an independent source, such as a statute. *Id.* at 577, 92 S.Ct. 2701. In the context of government benefits, a claim of entitlement is "grounded in the statute defining eligibility for them." [13] *Id.* Once a plaintiff establishes a protected property right, "the question remains what process is due"

prior to a deprivation of that interest. *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

■ The first task, then, is to determine whether Plaintiffs have a property interest in SSI benefits beyond the applicable seven-year limitation.[14] Central to this determination is the answer to the following question: Is the seven-year limitation a substantive component of a humanitarian immigrant's entitlement to SSI benefits? Or, alternatively, as Plaintiffs suggest, is the limitation a procedural device to ensure that humanitarian immigrants receive SSI benefits beyond seven years only if they have "diligently sought citizenship"? Pls.' Brf. at 34–35. Whether the seven-year limitation is substantive or procedural holds the key to Plaintiffs' due process claim.

#### 1. *The Welfare Reform Act's Plain Language*

The relevant statute reads as follows: "Notwithstanding any other provision of law and except as provided in paragraph (2), an alien who is a qualified alien ... is not eligible for any specified Federal program (as defined in paragraph (3))." 8 U.S.C. § 1612. Paragraph (3) includes the SSI program. *Id.* § 1612(a)(3)(A). Con-

---

**12.** Because the Court finds jurisdiction over the SSA proper under § 405(g), it is unnecessary to consider whether mandamus jurisdiction also lies under 28 U.S.C. § 1361. *See Mattern v. Mathews,* 582 F.2d 248, 253 (3d Cir.1978) (holding that, although authorities recognize that the Social Security Act does not bar mandamus jurisdiction, in light of 405(g) jurisdiction the mandamus question need not be reached).

**13.** Claiming that "[t]his is not a statutory case," Plaintiffs ignore the plain language of the statute and instead ask the Court to look to the "House report in 1997 which on its face created a legitimate expectation of continued receipt of benefits after seven years" while ignoring the plain language of the statute. Trans. of Hrg. of 3/7/07 at 81–83. The

Supreme Court has made clear, however, that a " 'property' interest in welfare payments [is] created and defined by statutory terms." *Bd. of Regents v. Roth,* 408 U.S. at 578, 92 S.Ct. 2701 (citing *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (due process claim implicated by withdrawal of public assistance benefits)). Plaintiffs do not advance any cases that support the creation of an entitlement to welfare benefits outside of the traditional statutory framework.

**14.** There is no dispute that Plaintiffs have a property interest in SSI benefits before the seven-year limitation expires. Welfare benefits, including SSI, "are a matter of statutory entitlement for persons qualified to receive them." *Atkins v. Parker,* 472 U.S. 115, 128, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985).

gress then carved out a "time-limited exception" for refugees and asylees:

> With respect to the specified Federal programs described in paragraph (3), paragraph (1) shall not apply to an alien until 7 years after the date—
>
> (i) an alien is admitted to the United States as a refugee . . .;
>
> (ii) an alien is granted asylum . . .;
>
> (iii) an alien's deportation is withheld . . .;
>
> (iv) an alien is granted status as a Cuban and Haitian entrant . . .; or
>
> (v) an alien is admitted to the United States as an Amerasian immigrant . . . .

*Id.* § 1612(a)(2)(A).

### 2. The Framework for Statutory Construction

The Third Circuit has laid the framework to follow in discerning the meaning of a statutory provision:

> Our analysis of this issue of statutory construction must begin with the language of the statute itself. Where statutory language is clear, and admits of no more than one meaning the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discussion. . . . Congress says in a statute what it means and means in a statute what it says there.

*In re American Pad & Paper Co.,* 478 F.3d 546, 554 (3d Cir.2007) (internal quotation marks and citation omitted). If the statutory language contains some ambiguity, the Court may then look outside the text to the relevant legislative history. *See id.*

> (a) *The plain language of the statute supports a finding that the time limitation is a substantive element of eligibility.*

The statute at issue here is clear upon its face. It bars SSI benefits to aliens, but then makes an exception to that bar by extending SSI benefits to humanitarian immigrants for seven years. Nothing in the plain language of the statute suggests that Congress intended the seven-year limitation to be a procedural proxy to ensure the diligence of humanitarian immigrants in applying for naturalization. In fact, nothing in the statutory language references the diligence of humanitarian immigrants at all.

> (b) *An examination of relevant legislative history also supports a finding that the time limitation is a substantive element of eligibility.*

Even assuming, *arguendo*, that the statutory language here contained some ambiguity that required a look outside the text, the legislative history of the seven-year limitation also supports a finding that the time limitation is a substantive element of eligibility, for two reasons.[15] First, the

---

**15.** In examining the legislative history to discern Congress's intent, the Court will not rely on the declarations, submitted by Plaintiffs, of Ron Haskins, the Republican staff member responsible for drafting the provision, and Doris Meissner, the former Commissioner of the Immigration and Naturalization Service when the provision was first implemented, as to Congress's intent in enacting the provision. These documents were created years after Congress passed the statute.

As the Federal Court of Appeals has explained:

> While a court may seek from the public record to ascertain the collective intent of Congress when it interprets a statute, the subjective intent of any particular person involved in the legislative process is not determinative. Thus the members of Congress, or staffpersons who draft legislation, are not deposed or called on to testify in actions involving statutory interpretation.

*Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 987 (Fed.Cir.1995) (analogizing patent interpretation to statutory interpretation). The Court's interpretive process is not a back door through which members of Con-

legislative history shows that in imposing a time limitation, Congress sought to promote self-sufficiency, remove SSI benefits as an incentive to immigration, and control financial costs to taxpayers. Congress was not concerned with the diligence of aliens applying for naturalization. Second, even when confronted with the problem of agency delay leading to the termination of benefits, Congress specifically chose not to extend SSI benefits based on a substantive requirement of diligence. Instead, Congress simply extended SSI benefits by an additional two years.

(i) *Congressional policy with respect to welfare and immigration*

Prior to 1996, humanitarian immigrants were entitled to SSI benefits on the same basis as United States citizens. Provision of such benefits was consistent with the United States' treaty obligations, which pledged the United States to provide benefits to refugees equal to those provided to citizens of the United States. *See* 1967 Protocol Relating to the Status of Refugees, Nov. 1, 1968, 19 U.S.T. 6223, 606 U.N.T.S. 267.

In 1996, however, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act (the "Welfare Reform Act"), which included the time limitation at issue in this case. Pub.L. No. 104–193, 110 Stat. 2301 (Aug. 22, 1996). When passing the Welfare Reform Act, Congress registered the following statements concerning national policy with respect to welfare and immigration:

(1) Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes.

(2) It continues to be the immigration policy of the United States that—

(A) aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations, and

(B) the availability of public benefits not constitute an incentive for immigration to the United States

\* \* \*

(5) It is a compelling government interest to enact new rules for eligibility ... to assure that aliens be self-reliant ....

(6) It is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits.

8 U.S.C. § 1601.

These express statements show that promoting self-sufficiency and removing benefits as an incentive to immigration appear to be what motivated Congress to act. Congress sought to address these "compelling governmental interests" when it limited the provision of SSI benefits to humanitarian immigrants. *City of Chicago v. Shalala,* 189 F.3d 598, 607 (7th Cir. 1999), *cert. denied,* 529 U.S. 1036, 120 S.Ct. 1530, 146 L.Ed.2d 345 (2000) (affirming constitutionality of Welfare Reform Act because, "[a]lthough reasonable individuals certainly can disagree on the wisdom of controlling immigration through such a policy, we must conclude that the provi-

gress can continue to advance their own legislative agendas. Thus, the Court cannot allow members of Congress, their staff, or just any individual claiming interest in the legislative drafting process to opine on Congress' intent in passing a particular statute. The Court will only look to the traditional sources of legislative intent, which include the language of the statute itself and other statements made on the public record prior to the passage of the statute.

sions of the Welfare Reform Act are rationally related to the legitimate governmental goal of discouraging immigration that is motivated by the availability of welfare benefits.").

The legislative history also demonstrates that when Congress passed the Welfare Reform Act it aspired, quite simply, to reduce the rising costs of operating federal benefits programs. For example, in the year before passage of the Act, the Social Security Commissioner testified before Congress about how certain proposals to limit SSI benefits to legal aliens would address "concern about the growth in the number of aliens on the SSI rolls, particularly in this time of limited Federal resources." Proposals to Reduce Illegal Immigration, Hearing Before the Senate Comm. on the Judiciary, 1995 WL 110439 (F.D.C.H. Mar. 14, 1995). The Commissioner further testified that "[t]he number of SSI recipients who are aliens has been increasing steadily. In December 1994, there were a little more than 738,000 aliens receiving SSI benefits. This is double the number of aliens receiving benefits 5 years ago. Alien recipients now constitute nearly 12 percent of the total number of SSI recipients." *Id.; see also* SSI: Problem Areas and Possible Reforms, Hearing on SSI Before the Senate Comm. on Finance, 1995 WL 128208 (F.D.C.H. Mar. 27, 1995) ("Another factor underlying the growth of SSI ... is the rapid growth of aliens on the rolls.").

When passing the Welfare Reform Act of 1996, which removed aliens' general eligibility for welfare benefits, Congress also registered its concerns regarding the public fisc:

> [A]liens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates.... Current eligibility rules for public assistance ... have proved wholly incapable of assuring that individual aliens not burden the public benefits system.

8 U.S.C. § 1601(3)-(4).

On the other hand, Congress never stated—and there is no other legislative history to support this proposition—that in passing the Welfare Reform Act, Congress intended to encourage diligence in applying for naturalization.[16]

(ii) *Congress addressed the problem facing Plaintiffs and chose not to indefinitely extend SSI benefits.*

One year after passing the Welfare Reform Act of 1996, Congress confronted the very problem facing Plaintiffs in this case: administrative delays causing the termination of benefits. Faced with this problem, Congress did not choose to indefinitely extend benefits, even to those who diligently applied for naturalization. Instead, it extended the length of eligibility by two years. This extension, right or wrong, reflected Congress's intent as to the appropriate length of time during which humanitarian immigrants would be eligible to receive SSI benefits prior to obtaining citizenship.

---

**16.** In *Shalala,* where the plaintiffs mounted an equal protection challenge to the Welfare Reform Act, the government took the position that one of the legitimate governmental purposes to which the Act was rationally related was "encouraging naturalization." 189 F.3d at 608. The Seventh Circuit rejected the plaintiffs' contention that "it is irrational to use the threat of starvation and homelessness to goad people into naturalization." *Id.* In finding that the Act "gives resident aliens in need of welfare benefits a strong economic incentive to become naturalized citizens," however, the Seventh Circuit noted that this "justification [is] not found in Congress' statement of policy." *Id.* Moreover, there was no discussion of how, if at all, the seven-year limitation was specifically related to the goal of encouraging naturalization.

As originally passed, the Welfare Reform Act extended SSI benefits to humanitarian immigrants for only *five* years. *See* Welfare Reform Act of 1996, Pub.L. No. 104–193, 110 Stat. 2301. The risk that the SSI benefits of humanitarian immigrants could be terminated, due to the expiration of the five-year eligibility period before citizenship could be obtained, was immediately recognized by the executive branch. That the failure to timely bestow citizenship on humanitarian immigrants eligible for SSI benefits would have dire consequences appears to have been well understood at the time. President Clinton, in his signing statement, directed INS to remove "all ·bureaucratic obstacles that stand in the way of citizenship for legal immigrants who are eligible." Statement by President William J. Clinton Upon Signing H.R. 3734, 1996 U.S.C.C.A.N. 2891, 2892; 32 Weekly Comp. Pres. Doc. 1487 (Aug. 26, 1996).

Soon thereafter, Congress also recognized the problem created by the limited eligibility period for SSI benefits provided to humanitarian immigrants. In 1997, recognizing that many humanitarian immigrants would not be able to obtain citizenship within five years, Congress extended the eligibility period to *seven* years. *See* The Balanced Budget Act of 1997, Pub.L. No. 105–33, 111 Stat. 251, *codified at* 8 U.S.C. § 1612(a)(2) (A)(i)-(ii).

Congress formally recorded its intention in enacting this extension:

> The 5–year exception in the welfare law was designed to allow refugees and asylees, who often arrive in the U.S. with few possessions, time to adjust to life here. However, because of delays in adjusting to permanent resident status, mandatory residency requirements before applying for citizenship, and recent increases in waiting times in the naturalization process, under the 5–year eligibility period many would become ineligible for welfare benefits despite their attempting to naturalize at their earliest opportunity. By extending the exception to allow these groups 7 instead of 5 years of eligibility, these noncitizens would be given more time to naturalize while continuing to receive welfare benefits without interruption.

H.R.Rep. No. 149, 105th Cong., 1st Sess. at 1182 (1997).

Faced with the clear problem of humanitarian immigrants becoming "ineligible for welfare benefits despite their attempting to naturalize at the earliest opportunity," Congress could have conditioned continued receipt of such benefits on a requirement of diligence. For example, Congress could have conditioned the continued receipt of SSI benefits on the timely filing of an application for naturalization, say, within seven years of receiving LPR status. Such a condition would ensure that humanitarian immigrants continued receiving SSI benefits, so long as they were diligent. Drafted this way, the seven-year limitation could be read as a procedural device rather than a substantive element of SSI eligibility.[17]

This is not the choice that Congress made. Congress elected instead to simply provide "more time" to receive SSI benefits. Congress did not extend SSI benefits

---

**17.** Congress's willingness to provide SSI benefits indefinitely to other classes of humanitarian immigrants is evidenced by other subsections of 8 U.S.C. § 1612(a)(2). For example, Congress extended SSI benefits to any alien "lawfully residing in the United States and who was receiving such benefits on August 22, 1996." *Id.* at § 1612(a)(2)(E).

Congress also extended continuous SSI benefits to aliens who filed an application before January 1, 1979 and "with respect to whom the Commissioner of Social Security lacks clear and convincing evidence that such individual is an alien ineligible for such benefits as a result of the application of this section." *Id.* at § 1612(a)(2)(H).

indefinitely. This election is consistent with the policy statements that Congress expressed just one year earlier, when Congress stated that aliens should "not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations" and that "the availability of public benefits [as] an incentive for immigration to the United States" should be discouraged. 8 U.S.C. § 1601. Congress believed that seven years was sufficient time "to adjust to life here" in the United States and become naturalized. H.R.Rep. No. 149, 105th Cong., 1st Sess. at 1182 (1997). Although the result may be harsh upon some of the applicants, the Court is not free to second guess this policy choice by Congress.

2. *The cases relied upon by Plaintiffs are distinguishable.*

Plaintiffs rely on *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), to support their contention that the seven-year limitation is procedural, not substantive, in nature. In *Logan*, the plaintiff timely filed a discrimination claim before the Illinois Fair Employment Practices Commission. *Id.* at 426, 102 S.Ct. 1148. This filing triggered the Commission's obligation to convene a fact-finding conference within 120 days. *Id.* The Commission, however, inadvertently scheduled the conference five days too late. *Id.* The Supreme Court of Illinois held that this failure to comply with the 120-day period deprived the Commission of jurisdiction to consider the plaintiff's

charge and dismissed the complaint. *Id.* at 427–28, 102 S.Ct. 1148.

The United States Supreme Court reversed, holding that the dismissal of the plaintiff's complaint violated his due process rights. *Logan*, 455 U.S. at 438, 102 S.Ct. 1148. The Supreme Court first determined that the plaintiff had a legitimate claim of entitlement to use the state agency's adjudicatory procedures to pursue his cause of action for discrimination. *Id.* at 428–29, 102 S.Ct. 1148. In so holding, the Supreme Court found that the 120–day limit was "a procedural limitation on the claimant's ability to assert his rights, not a substantive element of the FEPA claim." *Id.* at 433, 102 S.Ct. 1148. It then held that termination of the plaintiff's claim without considering its merits violated due process. *Id.* at 434, 102 S.Ct. 1148.

*Logan* would help Plaintiffs if they could show that they were entitled to SSI benefits and that the seven-year limit was just a procedural limitation to terminate the SSI benefits of the undiligent, not a substantive element of their eligibility. As discussed above, however, Congress simply did not intend "to condition SSI benefits for humanitarian immigrants upon their diligent pursuit of citizenship." Pls.' Brf. at 38. Rather, the traditional tools of statutory construction show that the time limitation is part of the substantive definition of Plaintiffs' entitlement to SSI benefits.[18] In *Logan*, the 120–day limitation was a means to an end, not a definition of the plaintiff's entitlement itself. That is not the case here.

---

18. In the alternative, Plaintiffs contend that the "SSA could have interpreted the seven-year deadline to include a tolling provision and thereby allowed the plaintiffs to continue receiving SSI benefits until they received a determination on the merits of their citizenship applications." Pls.' Brf. at 48. Section 1612 is silent with respect to the issue of

equitable tolling, and the SSA's decision not to read into the statute an equitable tolling provision is a permissible construction of the statute. *See Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Accordingly, the Court will defer to the SSA's interpretation on this matter.

The case of *Shvartsman v. Apfel* offers an instructive contrast in this regard. 138 F.3d 1196 (7th Cir.1998). In *Shvartsman*, the plaintiffs were LPRs who received food stamps and whose applications for naturalization were still pending when Congress passed the Welfare Reform Act of 1996. *Id.* at 1197. The food stamps program entitled qualified recipients to food stamps for twelve months, after which time benefits terminated automatically. *Id.* However, as the end of the twelve-month period approached, recipients could engage in a streamlined "recertification process" to establish their continuing eligibility for food stamps. *Id.*

When Congress passed the Welfare Reform Act of 1996, as with SSI benefits, it added for the first time a citizenship requirement to the food stamp program's eligibility criteria. *Shvartsman*, 138 F.3d at 1197; 8 U.S.C. § 1612(a)(1). The Act provided transition procedures for applying the new citizenship requirement, but if LPRs could not prove their citizenship in those procedures, their food stamps were terminated. 138 F.3d at 1197. In effect, LPRs receiving food stamps were cut off on August 22, 1997 unless they became citizens prior to that date, even if they had diligently pursued their citizenship. *Id.*

The LPRs brought a class-action suit alleging that the statutory transition procedure, coupled with the agency delay in processing citizenship applications, violated their due process rights to a fair opportunity to prove continuing eligibility for food stamps. *Shvartsman*, 138 F.3d at 1197. Perhaps most salient to this case, the plaintiffs "emphasize[d] that they [did] not claim a property right directly in a continuous stream of benefits, which they concede[d] would be a losing claim given the time-limited nature of the entitlement to Food Stamps." *Id.* at 1198. Instead, citing *Logan*, the plaintiffs claimed a property interest only in the fair opportunity to

establish their continuing eligibility for benefits by, in turn, establishing their eligibility for citizenship. *Id.* The Seventh Circuit rejected this argument:

> The plaintiffs would have a stronger argument under *Logan* if they could establish a property entitlement to the Food Stamp benefits themselves; in that case, deprivation of the entitlement without a meaningful, fair opportunity to prove continuing eligibility could indeed violate due process. However, the plaintiffs concede that there is no such property right in continuing benefits, and their attempt to make access to the recertification procedures into a substantive right of its own is unavailing.

*Id.* at 1200. Because the LPRs could not establish deprivation of a property interest, their due process claim failed. *Id.*

Like the LPRs in *Shvartsman*, Plaintiffs here stand to lose their benefits because of agency delays in the processing of their applications for naturalization. Moreover, although they have not conceded the point, as in *Shvartsman*, Plaintiffs do not have an entitlement to benefits given the time-limited nature of their entitlement. Without a property deprivation, Plaintiffs have no argument under *Logan*. The principles of due process simply do not require that Plaintiffs be provided a fair opportunity to prove their eligibility for citizenship prior to the termination of their benefits.

3. *Plaintiffs do not have an entitlement to the procedures for applying for LPR status or naturalization.*

■ At the hearing on this matter, Plaintiffs also claimed a property interest in the orderly and timely processing of their applications. This claim also fails.

Plaintiffs claim that *Logan* supports an entitlement to "adjudicatory procedures." 455 U.S. at 428–29, 102 S.Ct. 1148. Generally, courts have not countenanced claims

to a property interest in *processes*, and as discussed above, the Seventh Circuit soundly rejected such a claim in *Shvartsman*. More importantly, in *Mudric v. Attorney General*, the Third Circuit specifically rejected an immigrant's due process claim based on a claim of entitlement to the timely processing of his application. 469 F.3d 94, 98 (3d Cir.2006). In *Mudric*, a Serbian immigrant claimed that INS delays in processing his asylum application prevented him from receiving asylum, because by the time the INS processed his claim, conditions in Serbia had changed so as to no longer warrant asylum. *Id.* The Court held that the immigrant had neither an entitlement to asylum nor, more importantly, to have his "immigration matter[ ] adjudicated in the most expeditious manner possible." *Id.* at 99.

### 4. Conclusion

In interpreting a statute, the Court's role is not to "assess the relative merits of different approaches" to the problem that Congress faced. *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 13, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000). "Achieving a better policy outcome—if what [Plaintiffs] urge is that—is a task for Congress, not the courts." *Id.* Nor is the Court licensed to soften the blows of Congressional action (or inaction). The Court's role is, simply, to interpret the laws that Congress has passed, as dis-

cerned from examining the statute's plain language and, where appropriate, the legislative history pursuant to the recognized tools of statutory construction. Here, such an examination leads to the inevitable conclusion that humanitarian immigrants have no legitimate claim of entitlement to SSI benefits past the seven-year limitation to establish a property interest protected by the Due Process Clause. To the extent Plaintiffs seek to change the substance of that entitlement, they must petition Congress, not the Court.[19]

■ "It is axiomatic that a cognizable liberty or property interest must exist in the first instance for a procedural due process claim to lie." *Mudric*, 469 F.3d at 98. Because Plaintiffs cannot allege the deprivation of a property interest, they cannot state a claim for violation of their rights to due process. This claim must be dismissed. Furthermore, because the remaining claims involve only the conduct of CIS and the FBI, dismissal of the SSA as a defendant in this case is warranted.

### B. Plaintiffs' Equal Protection Claim

Plaintiffs also allege that their rights to equal protection of the laws have been violated "because defendants' actions have caused some humanitarian immigrants diligently pursuing citizenship to be cut off [from] SSI benefits, while other identically situated [humanitarian immigrants] have

---

**19.** In this case, it cannot be said that Congress has been inattentive to administrative hurdles, perhaps unforeseen, which have been encountered in implementing the statute. Congress has amended the Welfare Reform Act at least four times since its passage in 1996, and each amendment has expanded aliens' eligibility for welfare benefits. *See* Pub.L. No. 105–33, 111 Stat. 251 (Aug. 5, 1997) (extending benefits to aliens receiving SSI on August 22, 1996, and disabled aliens lawfully residing in the United States on August 22, 1996); Pub.L. No. 105–185; 112 Stat. 523 (June 3, 1998) (extending food

stamp eligibility to elderly aliens, children, and certain Hmong and highland Laotians); Pub.L. No. 105–306, 112 Stat. 2926 (Oct. 28, 1998) (clarifying previous extension of SSI benefits); Pub.L. No. 107–171; 116 Stat. 134 (May 16, 2002) (further extending food stamps to aliens who are disabled, children, or have resided in the United States for five years). At oral argument, Plaintiffs' counsel acknowledged that they had not petitioned Congress for relief and were aware of no other such efforts. Trans. of Hrg. of 3/7/07 at 73.

had their applications for citizenship processed in time to avoid an interruption of SSI benefits." Pls.' Brf. at 50. Plaintiffs allege three types of unequal treatment: (1) applicants who file in a year when the processing backlog is relatively low receive continuous benefits, while those who file in backlogged years have their benefits terminated; (2) applicants who file in a field office with a relatively small backlog receive continuous benefits, while those who file in a more-backlogged office are cut off from benefits; and (3) applicants who file in offices that expedite their applications, pursuant to Memorandum 22, receive continuous benefits, while applicants who file in other offices that do not are cut off from benefits. *Id.*

### 1. *The Standard of Review for Equal Protection*

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "no state shall ... deny to any person within its jurisdiction the equal protection of the laws." Although the Fifth Amendment, which applies to the federal government, does not contain an Equal Protection Clause, as does the Fourteenth Amendment which applies only to the states, the principles of the Equal Protection Clause are equally applicable to the federal government. *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Moreover, "[i]t is undisputable that our constitution provides due process and equal protection guarantees to aliens as well as citizens." *DeSousa v. Reno*, 190 F.3d 175, 184 (3d Cir.1999).

### (a) *Disparate treatment claims require intent to Discriminate.*

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike" under the law. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105

S.Ct. 3249, 87 L.Ed.2d 313 (1985). Its purpose "is to secure every person ... against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). There are two manners in which a statute may be challenged under the Equal Protection Clause. The first challenge involves a claim that the statute, on its face, expressly discriminates in an impermissible way. The second challenge involves a claim that the statute, while perhaps valid on its face, violates the Equal Protection Clause in its execution, because it results in intentional disparate treatment of similarly situated individuals. In this case, Plaintiffs' equal protection challenge is not a facial attack of any particular CIS policy; rather Plaintiffs attack the unequal implementation of CIS policy among different aliens.

The viability of a claim challenging the unequal implementation of a statute is well established. "[D]iscriminatory enforcement of a facially valid law is also unconstitutional under the Equal Protection Clause." *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir.2005) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)). Public officials engage in unconstitutional discriminatory application or administration of a facially impartial law when they seek to enforce the law "on the basis of an unjustifiable standard, such as race, or religion, or some other arbitrary factor," or when they seek to enforce the law in order "to prevent the exercise of a fundamental right." *United States v. Schoolcraft*, 879 F.2d 64, 68 (3d Cir.), *cert. denied*, 493 U.S. 995, 110 S.Ct. 546, 107 L.Ed.2d 543 (1989). In *Yick Wo*, the Supreme Court struck down a statute that required a license to operate a laundromat where such a license had been

granted to only one out 200 Asians. 118 U.S. at 374, 6 S.Ct. 1064. The Supreme Court concluded that a law which is "fair on its face and impartial in its appearance" may nonetheless constitute "illegal discrimination between persons" "if it is applied and administered by public authority with an evil eye and an unequal hand." *Id.* at 373–74, 6 S.Ct. 1064.

■ Allegations that a statute has a disparate effect are not sufficient, on their own, to state an equal protection claim. A plaintiff must also show that the defendant intended to discriminate in a manner that led to the disparate effect. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (holding that equal protection claim failed because there was insufficient evidence that village's refusal to rezone land to allow plaintiff to build racially integrated low-income housing was motivated by race-based discrimination); *Washington v. Davis,* 426 U.S. 229, 242, 244–45, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (holding that equal protection claim failed, because the plaintiffs showed no discriminatory *intent* in police department's use of verbal skills test that was failed, disproportionally, by African Americans). In other words, the alleged disparate effect must be the result of "purposeful" discrimination. *Washington,* 426 U.S. at 253, 96 S.Ct. 2040 (Stevens, J., concurring).[20]

(b) *Intra–Alien classifications warrant only rational basis review.*

Although the Equal Protection Clause directs, in general, that all persons similar-ly situated be treated alike, it is, of course, the very nature of legislation to differentiate between different classes and then afford preferential treatment to one class over the other. *See, e.g., Toll v. Moreno,* 458 U.S. 1, 39, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982) (Rehnquist, J., dissenting) (asserting that "all laws classify"). Thus, the general rule is that legislation is presumed valid and will be sustained if the classification drawn by the statute, or its implementation, is rationally related to a legitimate government interest. *City of Cleburne,* 473 U.S. at 439, 105 S.Ct. 3249. These are policy choices and provide the grist of legislative work.

The general rule of rational basis review gives way, however, when a statute classifies by race, alienage, or national origin, in which case a statute must be subjected to strict scrutiny and will be sustained only if the challenged classification is suitably tailored to serve a compelling state interest. *Cleburne,* 473 U.S. at 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). As Justice Stone explained, in his famous *Carolene Products* footnote, strict scrutiny of such classifications is warranted because "prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry." *United States v. Carolene Products Co.,* 304 U.S. 144, 153 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938). *See also Graham v. Richardson,* 403 U.S. 365, 372, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) ("[C]las-

---

**20.** Plaintiffs do not allege that CIS's decision to expedite some applications, but not others, is motivated by any particular invidious intent or ill will harbored against humanitarian immigrants in certain offices. *See Willowbrook v. Olech,* 528 U.S. 562, 565, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (holding that the plaintiff's allegations that a village "intention-ally demanded a 33–foot easement as a condition of connecting [the plaintiff's] property to the municipal water supply where the Village required only a 15–foot easement from other similarly situated property owners ..., quite apart from the Village's subjective motivation, are sufficient to state a claim for relief under traditional equal protection analysis.")

sifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny." Aliens as a class are a prime example of a "discrete and insular" minority.).

■■■ Here, the classifications that Plaintiffs challenge do not draw lines between aliens and United States citizens. Rather, they distinguish between aliens and other aliens, namely, those that file applications at different times or in different offices from other aliens. Such classifications warrant only rational basis review by the Court.

The Supreme Court addressed such intra-alien classification in *Mathews v. Diaz*, 426 U.S. 67, 69, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). In that case, the Supreme Court considered an equal protection challenge to 8 U.S.C. § 1612, which discriminated among aliens by granting Medicare benefits only to elderly aliens who had LPR status and had resided in the United States for five years. *Id.* at 69–70, 96 S.Ct. 1883. After noting that Congress is not required to treat citizens and aliens alike in the provision of welfare benefits, *id.* at 78–80, 96 S.Ct. 1883, the Court narrowly framed the question raised by the plaintiffs' challenge to the statute: "The real question presented by this case is not whether discrimination between citizens and aliens is permissible; rather, it is whether the statutory discrimination *within* the class of aliens—allowing benefits to some aliens but not to others—is permissible." *Id.* at 80, 96 S.Ct. 1883 (emphasis in original). The Court answered that question by holding that discrimination between the classes of aliens in the provision of Medicare benefits was permissible, because the line Congress drew reasonably favored those aliens who could be presumed to have a greater affinity to the United States. *Id.*

In arriving at this decision, the Supreme Court exercised extra caution in reviewing a federal statute that discriminated among aliens in the provision of welfare benefits:

> For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government. Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary .... Any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution. The reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization.

*Id.* at 81–82, 96 S.Ct. 1883.

■■■ The Third Circuit has also reiterated that the "disparate treatment of different groups of aliens" may violate equal protection, although it "triggers only rational basis review." *DeSousa*, 190 F.3d at 184 (citing *Francis v. Immigration & Naturalization Service*, 532 F.2d 268 (2d Cir. 1976)). Under the standard of review applicable to classification among aliens, a classification is accorded "a strong presumption of validity" and "can be upheld as constitutional even when it is based on rational speculation rather than on empirical data." *Id.* (citing *Heller v. Doe*, 509 U.S. 312 at 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)). The Third Circuit has directed that "[o]nce a facially legitimate reason for the classification is found, whether such a reason was articulated by

Congress or not, [a court] must rule the classification constitutional." *Id.*

Accordingly, the Court will apply a rational basis standard, exercising the caution called for by *Diaz* and *DeSousa.*

### 2. *Plaintiffs have stated a claim for violation of the Equal Protection Clause.*

As discussed above, Plaintiffs allege three types of unequal treatment. The Court finds that only the third type states a valid claim under the Equal Protection Clause.

### (a) *Unequal treatment as a result of unintended backlogs does not violate equal protection.*

The first two types of unequal treatment that Plaintiffs' describe do not violate the Equal Protection Clause. Both involve a disparate effect based on the lengths of backlogs in different years or offices. Because they do not involve intentional discrimination, they fail to state a claim under the Equal Protection Clause.

In an equal protection challenge to the application of a law, a plaintiff must allege that disparate treatment is the result of intentional or purposeful discrimination. *Village of Arlington Heights,* 429 U.S. at 264–66, 97 S.Ct. 555; *Washington,* 426 U.S. at 242, 96 S.Ct. 2040. Plaintiffs here do not allege that CIS intends for backlogs to build up unequally at different times or in different offices. As Plaintiffs describe them, these backlogs accumulate unequally, by happenstance, in the ordinary course of processing applications. The backlogs are not the result of any design or decision by CIS or the FBI.

The Third Circuit denied a challenge based on unintended backlogs in *Knight v. Tape, Inc.,* 935 F.2d 617, 621 (3d. Cir. 1991). In that case, pursuant to Pennsylvania law, a district court awarded a plaintiff delay damages that constituted pre-judgment interest of the compensatory award. *Id.* The district court had placed the case in its trial pool on May 30, 1989, but due to the court's backlog, did not bring the case to trial until February 5, 1990. *Id.* The defendant challenged the delay damages as violating the Due Process and Equal Protection Clauses. *Id.* The challenge was based, in part, on the fact that a portion of the pre-trial delay was caused not by defendant's dilatoriness, but by the court's own backlog of other matters. *Id.* The Third Circuit found that the statute providing for pre-trial delay damages was rationally related to promoting settlement, and upheld the delay damages under both the Due Process and Equal Protection Clauses. *Id.* at 629–30.[21]

In similar fashion, where courts have found processing delays to violate the Equal Protection Clause, such delay has been coupled with an intent to discriminate. *Cf. Hayes v. Muller,* No. 96–3420, 1996 WL 583180, *9 (E.D.Pa. Oct.10, 1996) (no equal protection claim because prisoner did not allege his request for parole review was intentionally "singled out" for delay) *with Jubilee v. Horn,* 959 F.Supp. 276, 280 (W.D.Pa.1997) (prisoner stated equal protection claim because alleged de-

---

21. In addressing the defendant's equal protection claim, the Third Circuit examined the unequal treatment between plaintiffs, who were not subject to delay damages, and defendants, who were subject to delay damages. *Knight,* 935 F.2d at 629. It did not specifically address whether unequal treatment as a result of backlogs violated the Equal Protec-

tion Clause. *Id.* Nonetheless, the Third Circuit's conclusion in *Knight* suggests that unequal treatment as a result of unintended backlogs does not violate the Equal Protection Clause. The Court appeared untroubled by the fact that different backlogs in different courts might result in unequal delay damages for different defendants.

lays included "an element of intentional or purposeful discrimination").

Accordingly, the Court finds that any difference in treatment that results from the different lengths of unintended backlogs does not violate the Equal Protection Clause.

(b) *Intentional and arbitrary implementation of the expedited policy constitutes a violation of equal protection.*

 Plaintiffs' third allegation of unequal treatment is that humanitarian immigrants who file applications in offices which grant requests for expedition receive continuous benefits, while applicants in other offices, which do not grant such requests, have been cut off. *See* Pls.' Brf. at 50. This unequal treatment is the result of an intentional decision to expedite applicants in some offices, but not other applicants in other offices, under Memorandum 22.[22] For example, Plaintiffs allege, CIS offices in Boston and Seattle are known to expedite humanitarian immigrants' applications, while most other offices do not. *Id.* at 13. Plaintiffs further allege that the basis for this decision to expedite is arbitrary and "without rational explanation." *Id.* at 14. These allegations, if true, constitute a claim for violation of the Equal Protection Clause.

(i) *Plaintiffs have alleged an intentional decision by CIS.*

The decision to expedite some but not other applications involves CIS officers in different offices making intentional decisions whether to implement Memorandum 22 or, alternatively, CIS intentionally allowing some offices to implement Memorandum 22 while others ignore it. As a result, some applicants are effectively "singled out" for expedition, while other similarly situated applicants are not, depending merely on which office an application is filed and whether that office grants expedition under Memorandum 22. *Cf. Hayes,* 1996 WL 583180 at *9; *Jubilee,* 959 F.Supp. at 280 (holding prisoners stated equal protection claim by alleging that some prisoners received expeditious resolution of their parole review, while other prisoners were intentionally singled out for delay in their review); *D'Amico v. Hayman,* No. 06–3886, 2007 WL 128890 (D.N.J. Jan.12, 2007) (holding that prisoner stated equal protection claim based on intentional disparate treatment that "includ[ed] delays in responding to his requests for a job change and television").

Because Plaintiffs' third allegation involves an element of intent, Plaintiffs have met the requirement that a disparate effect claim allege intentional discrimination. *See Village of Arlington,* 429 U.S. at 264–66, 97 S.Ct. 555; *Washington,* 426 U.S. at 242, 244–45, 96 S.Ct. 2040.

(ii) *Plaintiffs have alleged CIS's decision to expedite is based on an arbitrary factor.*

Intentional discrimination violates the Equal Protection Clause when it is based on an "arbitrary factor." *Schoolcraft,* 879 F.2d at 68. This prohibition against arbitrary discrimination applies to the context of discrimination between classes of aliens. *E.g. Francis,* 532 F.2d at 268. In *Francis,* for example, the Second Circuit struck down the application of a statute that discriminated arbitrarily among deportable aliens. *Id.* at 271. Specifically, § 212(c) of the Immigration and Nationality Act per-

---

**22.** As discussed above, CIS promulgated Memorandum 22, which provides for the expedition of humanitarian immigrants' applications, in recognition that, because of processing delays, many humanitarian immigrants would not be able to complete the naturalization process before the termination of their SSI benefits.

mitted the Attorney General to waive exclusion of entry into the United States for aliens who had traveled abroad and were seeking entry back into the country, but who would otherwise be excludable based on their criminal convictions, upon a showing of extraordinary hardship to the deportee or his family, or other exceptional circumstances. *See* former 8 U.S.C. § 1182(c) (1990).

A series of decisions by the Board of Immigration Appeals ("BIA") had extended § 212(c) relief, which on its face applied only to aliens in exclusion proceedings, to certain aliens in deportation proceedings. *Id.* Through its interpretations, the BIA had effectively created two classes of aliens identical in every respect except for the fact that, after becoming deportable, members of one class had left and returned to the United States without being stopped at the border. *See* 532 F.2d at 272. Only members of this class were eligible for § 212(c) relief.[23] *Id.* The Second Circuit held that the extension of § 212 relief on this basis violated the petitioner's right to equal protection. *Id.* There was simply no rational basis for rewarding a waiver to deportable aliens on the basis that they had simply left and then returned to the country. *Id.* at 272.[24]

*See also Tapia–Acuna v. INS*, 640 F.2d 223, 225 (9th Cir.1981) (agreeing with the Second Circuit that the § 212(c) waiver, as interpreted by the BIA, "create[d] a distinction that lack[ed] a rational basis").

Here, Plaintiffs have alleged that the basis for CIS's decision whether to expedite in different offices is "without rational explanation." *Id.* at 14. Taking the facts in the light most favorable to the Plaintiffs, as the Court must when deciding a motion to dismiss for failure to state a claim, *Ransom v. Marrazzo*, 848 F.2d 398, 401 (3d Cir.1988), the Court finds that Plaintiffs have sufficiently alleged that there is no rational basis for CIS's expediting applications in some offices but not in others. It is true that, under rational basis review, a classification is accorded "a strong presumption of validity" and "can be upheld as constitutional even when it is based on rational speculation rather than on empirical data." *DeSousa*, 190 F.3d at 184. At this stage of the proceedings, however, CIS has not proffered any rational basis for some offices, but not others, to expedite applications. In fact, at oral argument, Defendants conceded that "a totally arbitrary decision to expedite or not expedite would raise an equal protection claim,"

**23.** The details are tedious. First, in *Matter of G. A.*, 7 I. & N. Dec. 274 (1956), the BIA found an alien eligible for § 212(c) relief because he had left and then returned to the United States after he had become deportable. *Francis*, 532 F.2d at 271. The BIA reasoned that since the alien would have been eligible for § 212(c) relief if the INS had placed him into exclusion proceedings at the time he sought reentry, relief could be granted at his later deportation hearing. *Id.* Second, in *Matter of Smith*, 11 I. & N. Dec. 325 (1965), the BIA construed § 212(c) to apply to deportation proceedings where an alien had requested an adjustment of status under § 245 of the INA. *Id.* The BIA concluded that because the § 245 application subjected the alien to all bases for exclusion, the alien should also benefit from the waiver available

in exclusion proceedings. *Id.* At the same time, however, the BIA continued to refuse to grant § 212(c) relief to an individual who did not fall into one of the above two groups of deportable aliens. *Id.*

**24.** In contrast, in *DeSousa*, the Third Circuit addressed the question unanswered by *Francis*: "whether a Congressional grant of § 212(c) relief to excludable, but not deportable, aliens violates the Fifth Amendment's equal protection guarantee." 190 F.3d at 184. Applying rational basis review, the Third Circuit found the classification permissible, because "Congress rationally could have decided to encourage [criminal] aliens to voluntarily leave the country as a carrot to a potential waiver of removal when they sought reentry." *Id.*

but did not attempt to proffer any conceivable reason for CIS's unequal application of Memorandum 22. Trans. of Hrg. of 3/7/07 at 61.

Of course, the Constitution grants no entitlement to aliens to receive SSI benefits on an equal basis as United States citizens, *Diaz,* 426 U.S. at 80, 96 S.Ct. 1883, which, as Defendants point out, the United States provides to aliens out of its own "largesse," Dfts.' Brf. at 1. Nor does the Constitution obligate CIS to expedite aliens' applications for citizenship so that they may receive uninterrupted SSI benefits. However, where CIS decides to expedite applications, it must do so in a manner consistent with Constitutional safeguards, including the requirement that no person within the jurisdiction of the United States shall be denied "the equal protection of the laws." *See, e.g., Harper v. Virginia State Bd. of Elections,* 383 U.S. 663, 665, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (The Constitution does not provide that every individual has the right to vote, but "once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause . . . .").

The Court finds that Plaintiffs' allegations of intentional, unequal, and arbitrary application of the expedition policy state a valid cause of action under the Equal Protection Clause.[25]

### C. *Plaintiffs' Claims Under the APA*

Plaintiffs allege that CIS and the FBI have unreasonably delayed the processing of their applications for LPR status and naturalization, in violation of the APA.

The APA authorizes suit by "[a] person suffering legal wrong because of agency action." 5 U.S.C. § 702. "Agency action" is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or *failure to act.*" *Id.* § 551(13) (emphasis added).[26] Moreover, "relief" is defined as "taking of other action on the application or petition of, and beneficial to, a person." *Id.* § 511. The APA further requires that an agency, "[w]ith due regard for the convenience and necessity of the parties," "and within a reasonable time," "conclude a matter presented to it." *Id.* § 555(b). Finally, the APA permits a "reviewing court [to] compel agency action unlawfully withheld or unreasonably delayed . . . ." 5

---

**25.** Plaintiffs rely heavily on the concurring opinions of Justices Blackmun and Powell in *Logan,* in which the Justices opined that it was a violation of equal protection for claimants with identical employment discrimination claims to be treated differently, depending on whether the Illinois commission convened a hearing within the 120 days prescribed by statute. *See* 455 U.S. at 438, 102 S.Ct. 1148 (separate opinion of Blackmun, J., joined by Brennan, Marshall and O'Connor, J.J.); *id.* at 443, 102 S.Ct. 1148 (concurring opinion of Powell, J., joined by Rehnquist, J.). The Court will not apply *Logan* to this case. First, the majority opinion in *Logan* declined to address the plaintiff's equal protection claim, given that he had prevailed on his due process claim. *Id.* at 438, 102 S.Ct. 1148. Second, Justice Blackmun recognized that the equal protection

claim was "an unconventional one." *Id.* Third, since the *Logan* decision in 1982, no court in the Third Circuit has relied upon *Logan* to recognize an equal protection claim, and Plaintiffs have pointed to no other court which has applied the reasoning of *Logan's* concurring opinions. In any case, that reasoning is not necessary to find that Plaintiffs have stated a violation of equal protection here.

**26.** As the Supreme Court has explained, "[t]he final term in the definition, 'failure to act,' is . . . properly understood as a failure to take an agency action-that is, a failure to take one of the agency actions (including their equivalents) earlier defined in § 551(13)." *Norton v. S. Utah Wilderness Alliance,* 542 U.S. 55, 62, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004).

U.S.C. § 706(1). Congress need not have set a definitive deadline for an agency to act in order for a court to find a delay in agency action unreasonable; § 706(1) mandates that all action be done within a reasonable amount of time. *See Pub. Citizen Health Research Group v. Chao,* 314 F.3d 143, 152 (3d Cir.2002) (compelling agency to proceed with rulemaking although enabling legislation set no specific deadline for agency to do so).

 A "central point" is that the "only agency action that can be compelled under the APA is action legally *required.*" *Norton v. S. Utah Wilderness Alliance,* 542 U.S. 55, 63, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004). "Thus, a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take." *Id.* at 64, 124 S.Ct. 2373. A court may only compel an agency "to take action upon a matter, without directing *how* it shall act." *Id.*

### 1. *Plaintiffs State an APA Claim Against CIS.*

 Plaintiffs have stated a valid claim of unreasonable delay against CIS. According to Plaintiffs, CIS has either failed to act or has unreasonably delayed taking action on Plaintiffs' applications for LPR status or naturalization.[27]

Moreover CIS has a mandatory non-discretionary obligation to adjudicate such applications within a reasonable amount of time. It cannot simply ignore them. The CIS regulations' use of mandatory rather than permissive language supports this conclusion:

> Grant or denial. Subject to supervisory review, the employee of the Service who conducts the examination [on an applica-

tion for naturalization] *shall* determine whether to grant or deny the application, and *shall* provide reasons for the determination, as required under section 335(d) of the Act.

8 C.F.R. § 316.14(b)(1).

The majority of courts have thus concluded that "the CIS simply does not possess unfettered discretion to relegate aliens to a state of 'limbo,' leaving them to languish there indefinitely. This result is explicitly foreclosed by the APA." *Kim v. Ashcroft,* 340 F.Supp.2d 384, 393 (S.D.N.Y. 2004); *see also Liu Duan v. Zamberry,* No. 06–1351, 2007 WL 626116, 2007 U.S. Dist. LEXIS 12697 (W.D.Pa. Feb. 23, 2007) (CIS violated APA by unreasonably withholding naturalization decision); *Alkenani v. Barrows,* 356 F.Supp.2d 652, 657 (N.D.Tex.2005) ("[CIS has] a clear duty to process petitioner's application for naturalization within a reasonable time."); *Ngwanyia v. Ashcroft,* 302 F.Supp.2d 1076, 1083 (D.Minn.2004) (CIS violated APA by unreasonably withholding decision as to LPR status); *Yue Yu v. Brown,* 36 F.Supp.2d 922, 930 (D.N.M.1999) ("[C]ourts have specifically recognized jurisdiction under § 1331 and the APA to hear challenges to INS delays in processing visa, LPR, and citizen applications."); *Fraga v. Smith,* 607 F.Supp. 517, 520 (D.Or.1985) (jurisdiction under APA for challenge to INS delay in processing citizen applications for foreign born citizens). *But see Mustafa v. Pasquerell,* 2006 WL 488399 (W.D.Tex. Jan.10, 2006) (siding "with the minority decisions" to conclude court had no jurisdiction to compel CIS to act on delays in adjudicating applications for LPR status); *Badier v. Gonzales,* 2006 WL 4079085 (N.D.Ga. Dec.1, 2006) (CIS

---

**27.** While the Court finds that Plaintiffs have stated a claim of unreasonable delay, the question of whether or CIS has in fact delayed unreasonably involves a "fact-intensive" balancing test that the Court need not undergo at this stage of the proceedings. *See Oil, Chem., & Atomic Workers Union v. OSHA,* 145 F.3d 120, 123 (3d Cir.1998).

had no discrete duty to act because there is no statutorily prescribed time period within which the agency must act on an application for naturalization.).

Defendants argue that Plaintiffs' APA claim must fail because they have an adequate remedy at law pursuant to 8 U.S.C. § 1447(b). This argument fails for two reasons. First, the remedy that Defendants point to is clearly not adequate. Section 1447(b) allows an applicant for naturalization to seek relief from a district court when CIS has failed to take action within 120 days of the "examination" of that applicant. Here, Plaintiffs allege that CIS has not even examined them yet.[28] Courts considering whether § 1447 is the only mechanism through which applicants for naturalization may challenge inaction on their application have held that an APA claim is appropriate where § 1447 provides no avenue for the court to adjudicate an application. *See, e.g., Alkenani,* 356 F.Supp.2d at 656–57. Second, in any event, § 1447 does not apply at all to applications for LPR status; it only applies to applications for naturalization.

### 2. *Plaintiffs State an APA Claim Against the FBI.*

Plaintiffs also allege that the FBI has unreasonably delayed the processing of their applications in violation of the APA.

■ The "only agency action that can be compelled under the APA is action legally *required." Norton,* 542 U.S. at 63, 124 S.Ct. 2373. Identifying whether a mandatory duty exists is in essence an inquiry into legislative intent. Legislative intent may be revealed in the plain language of a single enactment, or as is the case often times, by examining several legislative enactments side by side, *Slatky v. Amoco Oil Co.,* 830 F.2d 476 (3d Cir.1987)

(reviewing different statutes that together revealed Congress's intent in use of the phrase "bona fide"), or by examining a legislative scheme as a whole, *see Block v. Community Nutrition Institute,* 467 U.S. 340, 349, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984) (congressional intent necessary to overcome the presumption in favor of judicial review of administrative action "may be overcome by inferences of intent drawn from the statutory scheme as a whole"). Thus, an agency's mandatory duty to act may be expressed in a single statute or from several Congressional enactments which, read together, clearly imply a mandatory duty.

Here, there appears to be no single statute that, standing alone, expressly imposes a mandatory duty on the FBI to perform background checks. *See Zaytsev v. Gantner,* 2004 WL 2251665, at *1 (S.D.N.Y. 2004) ("The Zaytsevs have pointed to no authority demonstrating that the FBI owes a duty to conduct background checks, and this Court has found no such authority."). However, it appears clear from a number of Congressional enactments that Congress has imposed a mandatory duty on the FBI to perform background checks in these particular circumstances.

As discussed above, CIS has a mandatory duty to process applications for LPR status and naturalization, but Congress prohibited CIS from processing such applications until it receives completed background checks from the FBI. Pub.L. No. 105–119, 111 Stat. 2448 (Nov. 26, 1997).

In turn, Congress has also directed that the FBI may "establish and collect fees to process fingerprint identification records and name checks for non-criminal justice, non-law enforcement employment and licensing purposes," such as for immigration matters. Pub.L. No. 101–515, 104 Stat.

---

**28.** The Court does not reach the issue of whether the word "examination" in § 1447(b) refers to the date of the examination interview with a CIS officer, and not the entire "examination process." *See, e.g., El–Daour v. Chertoff,* 417 F.Supp.2d 679 (W.D.Pa.2005).

2101, 2112 (1990). The Congressional scheme then provides that aliens must submit application fees to CIS, 8 C.F.R. §§ 316.4, 334.2, a portion of which the CIS pays over to the FBI for fingerprint and name checks for that applicant. *See* 72 Fed.Reg. 4888–01 (proposed Feb. 1, 2007) (to be codified at 40 C.F.R. pt. 103) (proposing increase in application fee to pay, *inter alia*, "additional funds [to] the FBI for name check costs to enhance services"). Upon completion of the background check, the FBI submits a final report to CIS. Then, and only then, is CIS permitted to consider the application.

Under these limited circumstances, where Congress has conditioned CIS's mandatory action on the FBI's completion of background checks, and where applicants must pay the FBI, through CIS, to complete the background checks, the Court holds that Congress has, by implication, imposed on the FBI a mandatory duty to complete the background checks.[29] Since the FBI has a mandatory duty to act, the APA requires that the FBI complete the criminal background checks in a reasonable amount of time.

Accordingly, Plaintiffs APA claim against the FBI will not be dismissed.[30]

### 3. *Whether Alleged FBI Delays Are Attributable to CIS*

Plaintiffs concede that a "significant component" of the delay in processing their applications for naturalization is due to the FBI not having completed criminal background checks for some Plaintiffs. CIS has no mandatory duty to act on such applications until the FBI completes the checks. Thus, to the extent that Plaintiffs' claim of unreasonable delay against CIS involves allegations that this delay is caused by the FBI, these allegations fail to state a claim upon which relief may be granted.

This is so because CIS does not have a mandatory duty to take action on an application for naturalization until the FBI has completed its background checks. In fact, Congress has *forbidden* CIS from taking any action until such checks are completed. Specifically, Congress has mandated that "none of the funds appropriated or otherwise made available to [CIS] shall be used to complete adjudication of an application for naturalization unless [CIS] has received confirmation from the Federal Bureau of Investigation that a full criminal background check has been completed." Pub.L. No. 105–119, 111 Stat. 2448 (Nov. 26, 1997). Thus, if CIS is failing to process Plaintiffs' applications for naturalization *solely* because it is waiting for the FBI to complete criminal background checks, Plaintiffs' APA claim will fail. Without a showing of a mandatory duty to act, there can be no claim under the APA for unreasonable delay.

---

**29.** Of course, Congress could have elected to impose the duty in a single declaratory sentence. That through the vagaries of the legislative process it did so in a more circuitous way, through several enactments rather than a single one, is of no moment.

**30.** Defendants also argue that the APA claim against the FBI should be dismissed as moot because "all FBI background checks regarding named plaintiffs are complete." Dfts.' Reply at 16. Plaintiffs have argued, however, that "[o]nly when this lawsuit was filed was anything done to speed up the naturalization process." Pls.' Brf. at 14. While the Court notes "that voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot," unless "there is no reasonable expectation that the wrong will be repeated." *United States v. W.T. Grant Co.*, 345 U.S. 629, 632–33, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) (quoting *United States v. Aluminum Co. of America*, 148 F.2d 416, 448 (1945)), the Court need not reach the issue of mootness.

Accordingly, courts have routinely found CIS delays caused by FBI background checks to be justifiable delays. *See Alkenani,* 356 F.Supp.2d at 657 (finding the delay to be reasonable due to the pending FBI background check); *Zaytsev,* 2004 WL 2251665, at *1 (stating that CIS "is not required to make any determinations until the requisite security checks have been completed"); *Zheng v. INS,* 933 F.Supp. 338, 341 (S.D.N.Y.1996) ("The fact that the INS followed a procedure, dictated by statute, of waiting for clearance from the FBI does not amount to a wanton, willful, and reckless delay."); *Maldonado–Coronel v. McElroy,* 943 F.Supp. 376, 385 (S.D.N.Y.1996). Indeed, the Court is aware of only two instances in which a court compelled CIS to adjudicate applications despite the fact that FBI background checks were still pending. *See Singh v. Still,* 470 F.Supp.2d 1064 (N.D.Cal. Jan. 8, 2007) (rejecting CIS's argument that it could not be blamed for the slowness of a name check that delayed plaintiff's application for LPR status for seven years because the name check was the responsibility of the FBI, and granting summary judgment to plaintiff who claimed unreasonable delay by CIS); *Paunescu v. INS,* 76 F.Supp.2d 896, 903 n. 2 (N.D.Ill.1999) (rejecting defendants' attempts "to deftly transfer blame and responsibility from one governmental entity to another" as a "shell game"; noting that "[t]he INS, the FBI, and the State Department are all arms of the United States of America, a defendant in the instant case").

On the other hand, courts have not hesitated to find the CIS has unreasonably delayed processing of an application where the facts show the delay is fairly attributable to CIS and not the FBI. *E.g. Haidari v. Frazier,* No. 06–3215, 2006 WL 3544922, at *6 (D.Minn. Dec.8, 2006) ("[T]he FBI's delay here does not negate the USCIS's duty to process the Plaintiffs' applications in a reasonable time, both upfront when receiving the forms from the applicants, and later when receiving the requested information from the FBI.").

Whether the delay is attributable to the FBI or CIS is a factual matter, however, that cannot be resolved at the motion to dismiss stage.

### D. *Issue Preclusion*

■ Plaintiff-asylees' claim that CIS violated the APA by delaying adjustment of status for those granted asylum is not barred by the settlement in *Ngwanyia v. Gonzales,* 376 F.Supp.2d 923 (D.Minn. 2005). Although, broadly, both *Ngwanyia* and this case involve asylees [31] bringing claims against the CIS under a theory of unreasonably delay in the processing of applications for LPR status, the precise facts and legal issues involved in each case are distinct and separate.[32]

### 1. *The Ngwanyia Case*

*Ngwanyia* involved a class of "[a]ll asylees in the United States who have applied for [LPR] status and whose applications for adjustment remain pending." 376 F.Supp.2d at 925. Under the Refugee Act, CIS can adjust up to 10,000 asylees already in the United States to LPR status each year. 8 U.S.C § 1159(b). The asy-

---

**31.** Defendants argue that *Ngwanyia* only precludes the *asylees* in this case from re-litigating a claim of unreasonable delay in the processing of their applications for LPR status; they do not raise this argument as to refugees, Cubans, Haitians, or Amerasians.

**32.** Generally, motions based on issue preclusion, especially within the class action context, are too fact-intensive to appropriately decide on a motion to dismiss. *E.g. Pryor v. NCAA,* 288 F.3d 548, 559–60 (3d Cir.2002). Here, however, there are no facts in dispute that are outcome-dispositive, and the Court may dispose of the motion.

lees in *Ngwanyia* claimed that CIS unlawfully withheld agency action by not adjusting 10,000 asylees each year and sought to compel CIS to use the unused allotments from past years. 302 F.Supp.2d at 1081. CIS, in turn, conceded that it was "obligated to reach the 10,000 allotment for asylee adjustment set by Congress," and that incessant processing errors "almost guarantee[d] that we will not fully use the 10,000 numerical allocation provided by statute" each year. *Id.* CIS defended its refusal to use allotments from past years, however, by claiming that the allotments available for any given year expired at the end of that year; moreover, there was no statutory authority or requirement to retroactively grant adjustment using a prior year's allotment of adjustment figures. *Id.*

After the court granted summary judgment in favor of the asylees, the parties settled the case, agreeing that 31,000 asylee adjustment allotments remained available from prior years and would be used within the next three years. *See Ngwanyia*, 376 F.Supp.2d at 924; Settlement Agreement ¶ 20, Ex. E to Dfts.' Brf. The settlement took effect on July 12, 2005. 376 F.Supp.2d at 923.

2. *Issue preclusion applies only where an issue was necessary to the adjudication of a prior case.*

 Under the doctrine of issue preclusion, a determination by a court of competent jurisdiction on an issue necessary to support its judgment is conclusive in subsequent suits based on a cause of action involving a party or one in privity. *Del. River Port Auth. v. FOP, Penn–Jersey Lodge 30*, 290 F.3d 567, 572 (3d Cir. 2002). Preclusion is appropriate where: "(1) the identical issue was decided in a prior adjudication; (2) there was a final judgment on the merits; (3) the party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against

whom the bar is asserted had a full and fair opportunity to litigate the issue in question." *Id.* at 574.

In order for the issues to be identical for preclusion purposes, Defendants must show that the issues litigated in this case were necessary to the adjudication of *Ngwanyia*. *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 250 (3d Cir.2006). The requirement that a preclusive finding must have been necessary to a judgment is rooted in principles of fairness. *Id.* "[P]arties should be estopped only on issues they actually deem important, and not on incidental matters." *Id.* (citing *Lynne Carol Fashions, Inc. v. Cranston Print Works Co.*, 453 F.2d 1177, 1183 (3d Cir.1972)). Because litigants are likely to view an issue that is necessary to the resolution of a case as important and to litigate it vigorously, it is fair to give such a determination preclusive effect. *Id.* The necessity requirement also ensures that preclusive effect is not given to determinations that did not "receive close judicial attention," or that were unappealable by virtue of being incidental to a decision. *Id.*

For example, in *Lynne Carol*, the Third Circuit reversed a district court's dismissal of the plaintiff's action based on grounds of issue preclusion. 453 F.2d at 1179. The plaintiff, a cloth purchaser, bought cloth from a cloth converter but was unhappy with the quality. *Id.* The plaintiff withheld payment, and the cloth converter sought arbitration under the contract. *Id.* Plaintiff defended that the goods were not fit for their normal and intended use, but the arbitrator rejected this argument and found for the cloth converter. *Id.* While the arbitration proceedings were underway, the plaintiff filed an action against a finishing company alleging that the finishing company had caused the damage to the cloth. *Id.* The district court granted sum-

mary judgment to the finishing company on the grounds that the plaintiff was precluded by the arbitration award from asserting the goods were damaged. *Id.* at 1182. The Third Circuit reversed, finding that the issues in two proceedings were not identical:

> Superficially, it appears that the quality of the goods in question was squarely before the arbitrators. However, close analysis reveals that the precise issue as to the quality of the goods presented to the arbitrators ... was whether the goods sold were not fit for the normal and intended use of such fabric by the purchaser, with the purpose of the use known to the seller. On the other hand, the complaint in the district court alleges that the goods were manufactured, produced, printed and designed by the defendant and were defective when they left the defendant's control.

*Id.* at 1183.

Important to the Third Circuit's decision was the fact that the plaintiff "would have to introduce different evidence" to prove its claims in each proceeding. *Id.* In the arbitration, the plaintiff would have to produce evidence that the goods were not fit for their intended use; in the lawsuit, the plaintiff would have to prove that any damage to the goods was caused by the defendant finishing company. *Id.*

3. *None of the issues necessary to the adjudication of Ngwanyia are identical to issues in this case.*

Defendants have not met their burden of showing that the issues decided in *Ngwanyia* are identical to the issues presented by Plaintiff-asylees in this litigation. Both cases involve broad allegations of "unreasonable delay" in CIS's processing of application. In *Ngwanyia*, however, the adjudication of the reasonableness of CIS's delay turned on the proper *interpretation* of the statutes allowing CIS to grant 10,-000 asylees LPR status each year. It was not necessary in *Ngwanyia* to determine whether CIS's processing *procedures* were reasonable or unreasonable. That determination was irrelevant to the deciding whether allotments from prior years had expired or were still available for LPR status. CIS's reasonableness was not deemed important to the parties. In fact, CIS conceded processing errors caused delays but claimed that it could not use "expired" allotments from prior years to cure those delays.

In this case, CIS does not concede any error or unreasonableness in its processing of LPR applications. That is one of the precise issues before the Court, an important issue that was not litigated or necessary to the adjudication of *Ngwanyia*. Proof of CIS's alleged unreasonable delay will thus require evidence not before the court in *Ngwanyia*.

At the hearing on this matter, Defendants appeared to concede that Plaintiff-asylees' claim for unreasonable delay in this case was not "specifically before the court" in *Ngwanyia*, but maintain that because that claim "existed" at that time it was extinguished by settlement. The release in the Settlement Agreement itself undermines such an argument: "Nothing in this Agreement shall limit the right of a class member to ... exercise any independent statutory or regulatory rights they may have, outside the scope of this Agreement, under the Immigration and Nationality Act ...." Settlement Agreement ¶ 43, Ex. E to Dfts.' Brf.

Accordingly, Plaintiff-asylees' claims in this case are not precluded by the *Ngwanyia* settlement.

## V. CONCLUSION

For the reasons set forth above, the Court finds it has jurisdiction to hear the first action against the SSA, as it is appro-

priate to waive the requirement that Plaintiffs exhaust their administrative remedies. Plaintiffs' due process claim against the SSA, however, must be dismissed because Plaintiffs do not have a property interest in any SSI benefits after the seven-year limitation imposed by Congress. As to the second action, on the other hand, Plaintiffs have stated two viable claims. First, they have stated a claim under the Equal Protection Clause based on their allegations that different applicants receive different treatment because of CIS's inconsistent implementation of the expedition policy embodied in Memorandum 22. Plaintiffs have also stated a valid claim of unreasonable delay against CIS and the FBI under the APA. Finally, the Court finds that the APA claim against CIS and the FBI is not precluded by a settlement in a prior case.

An appropriate order follows.

## ORDER

**AND NOW**, this **29th** day of **March, 2007**, for the reasons stated in the accompanying Memorandum, it is hereby **ORDERED** that Defendants' Motion to Dismiss (doc. no. 14) is **GRANTED** in part and **DENIED** in part.

The motion is **GRANTED** to the extent that Defendants' claim that Plaintiffs fail to state a cause of action under the Due Process Clause against the Social Security Administration ("SSA").

The motion is **DENIED** to the extent that Defendants (1) seek to dismiss this action for lack of subject matter jurisdiction, or (2) claim that Plaintiffs fail to state a cause of action under either the Equal Protection Clause or Administration Procedure Act.

**AND IT IS SO ORDERED.**